STATE OF IOWA v. FRANK A. NOVAK, Appellant.

**Evidence:** CORPUS DELICTI. In a prosecution for murder where the theory of the state, resting on circumstantial evidence, was that defendant intended that the body of deceased should be mistaken for his own, so that his estate might collect his life insurance, evidence that defendant was insolvent; that he carried about $27,000 life insurance; that M. was with him on the afternoon and evening at his store the night that it was burned; that M. had not been seen alive since a body which bore some marks of

identification as that of M. was found in the debris of the burned store; that defendant on the night of the fire mysteriously disappeared and went to the Klondike; that when arrested, before being told why, he denied his name and that he had resided or done business at the place of the homicide; that he admitted that M. was on a cot in the store the night it burned; that he was there and made no attempt to save the building or M.; that the body of M. was found on a cot in the basement on a bank of coal, under conditions that indicated it was there before the fire occurred; that his skull had been fractured before death in a way to cause death; that an identified check and a pair of scissors which belonged to defendant were found under the body of M.; and that they would not have been there unless placed there by design,—established the fact that M. was murdered.

**Statement of Accused While Under Arrest;** *Competency.* A statement, favorable to the maker, if true, voluntarily made by a defendant charged with murder, to the officer who had arrested him, pretending to narrate the circumstances of the decedent's death, after a promise by the officer, on the request of the defendant, that he would not repeat the statement until after defendant had gone before the grand jury and made it there, and made upon no other undue comment, is admissible, though the officer repeated it to the county attorney before the defendant went before the grand jury.

SAME. Statements made purporting to explain and narrate the circumstances of decedent's death, while he is under arrest and shackled, where it appears that no more restraint is placed upon than prudence required under the circumstances, are admissible in evidence, where there was no inducement held out to him to make them.

CONFESSION: *What does not amount to confessions.* Defendant, while returning, in custody of the officer who had arrested him, to the place of the homicide, stated to the officer that he had met with financial losses, and had expected to go the day after a fire to an uncle to get him to endorse a note for him; that his safe had been robbed; that. to prevent further robberies, he had after consulting a physician as to how much morphine in a bottle of whisky would knock out a person without killing him prepared a bottle of whisky, and placed it where it would be likely to be seen and drunk by a robber working on the safe; that M. came into his store, and in his absence drank from the bottle; that defendant on his return discovered this, and that M. was in stuper, whereupon he took him to his room up over the store, and put him in his bed; that he laid down on the counter in the store, and slept until he awoke in the night to find the store on fire; that he attempted to get M. out, but the smoke and heat prevented him doing so; that he returned to the store, and took

$160 from the cash drawer; that, in groping his way out, he ran against his shot gun, which he had placed there to take with him when he went to see his uncle. as he expected to hunt on the way, and took it with him; that when he got outside of the store he realized that M. was in there; that he was heavily embarrassed, and that he thought the best thing that he could do was to fall off the earth for awhile; and then related to the officer the course which he took in going from the place of the homicide in Iowa to Dawson City, British Possessions. It further appeared from the testimony of the officer that defendant, when arrested, denied his true name. gave a fictitious one, and, on being informed that he was under arrest for the murder of M. committed in Iowa, denied that he had ever lived there, and claimed that he was from Ohio. *Held*, that the statements, made by defendant did not constitute a confession of the crime of murdering M. but. rather, declarations or admissions within rules distinguishing these from "confessions."

CREDIBILITY: *Jury question.* A statement of defendant purporting to narrate the facts and circumstances of decedent's death. given in evidence. must be considered as a whole, yet though those parts which are prejudicial to defendant will be presumed to be true, the jury are not bound to believe the statement true as to those parts, favorable to defendant. which are inconsistent with other facts and circumstances proven.

IDENTITY OF SKULL. It is not error to admit the skull of deceased in evidence in a murder trial, though it had been buried and then exhumed and left in the custody of the county attorney and a physician, and had not at all times been kept under lock and key, where it is shown that at the time it was offered in evidence it was in the same condition it was in when found after the homicide.

IDENTIFICATION. An emblem which was one of religious significance in the Catholic church was found on the body of M. It was shown that one of such emblems had been given to him some time prior to the homicide that he had worn it, and that Catholics usually wore them through life. *Held*, that such emblem, in connection with evidence that M. was a Catholic, was admissible for the purpose of identifying the body found as that of M.

SAME. It is not error, for the purpose of establishing the identity of deceased, to admit in evidence pieces of his shirt, in connection with evidence of his sister that she took them from the body of deceased that they were of similar quality to a shirt she had given him. and that she believed they were a part of the shirt. she gave him.

INSTRUCTIONS: *Construed to be not in conflict.* The court instructed the jury "that where a conviction is sought on circumstantial evidence alone the state must not only show by a *preponderance*

of the evidence that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused, and incapable of explanation on any reasonable hypothesis, other than guilt of the accused. * * * If then all the facts and circumstances established by the evidence beyond a reasonable doubt cannot be reconciled with any reasonable hypothesis of the defendant's innocence, but do concur in showing the defendant's guilt, and when taken together are sufficient to prove beyond a reasonable doubt the guilt of defendant of the crime charged in the indictment, then you are instructed to find the defendant guilty." The court further instructed the jury that "in this case the burden of proof rests upon the prosecution to make out and prove to the satisfaction of the jury, beyond every reasonable doubt every material allegation in the indictment, and, unless this is done, the jury should find the defendant not guilty." *Held*, that there was no such conflict in the instructions as to the degree of proof of each fact and circumstances required to convict, when considered as a whole, as to mislead the jury, to defendant's prejudice, that they charged that each material fact must be proven beyond a reasonable doubt, and that, read without a view to criticism, the use of "preponderance" in the first part had no tendency to make such a conflict as to mislead.

WATERMAN and LADD, J. J., dissenting.

ON PROOF OF INSANITY: *Weight.* An instruction to a jury in a criminal case that "every person is presumed to be sane and rational unless the fact is proven otherwise by a preponderance of the evidence; * * * that the acts of defendant are to be treated as acts of a sane man, unless the evidence shows not only a possibility that his mental condition was otherwise, but further shows by a fair preponderance of evidence * * * that defendant was suffering of abberation of mind, you are not required to find that defendant was irrational or insane, unless the evidence clearly establishes such fact, and should not find him insane except upon evidence of a reliable character, which convinces you that such fact is proven by a fair preponderance of all the evidence in the case bearing thereon,"—is not erroneous, as improperly stating the weight of proof required to prove insanity.

WITHDRAWAL BY INSTRUCTIONS: *Degrees.* A charge of killing by poison was withdrawn by the charge because of insufficient evidence to sustain it, and the jury permitted to consider whether the killing was by other means specified in another count of the indictment. *Held*, that though the evidence as to the use of poison was the strongest proof adduced to make a verdict of manslaughter possible, yet such a verdict would not have been warranted by the evidence, and the court was not bound to give

opportunity for an improper verdict to save defendant from conviction of a higher degree.

**Plea and Proof:** INDICTMENT: *Submission to jury.* Such evidence authorizes a submission of the case to jury, under a count which charges that the crime was committed by poisoning, mutilating, asphyxiating, burning, and otherwise injuring the said M., though the charge of poisoning was taken from the jury and though the state urges that the crime was committed with a deadly weapon, such insistence not being exclusive and there being evidence to sustain the indictment as the case stood after poisoning was withdrawn.

**Receiving Verdict:** CONTROL OF COURT OVER   A jury returned a verdict of guilty of murder in the second degree, and fixed the punishment at imprisonment for 10 years, whereupon the court informed them that the verdict was not in proper form, and could not be received, and directed the form that should be used if they found the defendant guilty in that degree, and told them if they made any recommendation that it should be separate from the verdict. They retired, and returned a verdict of guilty in the second degree, and also a request, separate from it, that the punishment be imprisonment for 10 years. The first verdict was not entered in the record, except that the reporter entered it in his minutes. *Held*, that under Code, section 3675, which provides that the reporter shall make a record showing a return of the verdict and action thereon of whatever kind, and any other proceedings before the court, judge, or jury, which, when certified, shall be a part of the record, the notes in the shorthand report of what was done about the first verdict did not constitute a receiving and entering by the court nor render it error to take the verdict brought in later.

**RECEIVING SECOND VERDICT:** *Harmless error.* Defendant contended that the jury might the second time have returned a verdict of guilty in the first degree or manslaughter, and that it was error to refuse to receive the first verdict. *Held*, that, if there was error in refusing to receive the first verdict, it was without prejudice, as they were both of the same legal effect, and should be disregarded, under Code, section 5462, which requires that the supreme court shall disregard technical errors.

**County Attorney:** NON-RESIDENT ASSISTANT: *Closing argument.* Under Code, section 5372, which provides that in a criminal trial, when the evidence is concluded, the county attorney shall, unless the case is submitted to the jury without argument, open, and, after the argument by defendant's counsel, close. the argument to the jury, it is not error to permit an attorney not a resident of the county, who has been employed to assist the county attorney, to make the closing argument.

VOL. 109 Ia—46

*Appeal from Benton District court.*—HON. G. W. BURNHAM Judge.

FRIDAY, MAY 26, 1899.

INDICTMENT for murder of the first degree. Verdict for murder of the second degree, and a judgment of life imprisonment. The defendant appealed.—*Affirmed.*

*J. J. Ney* and *Tom H. Milner* for appellant.

*Milton Remley,* Attorney General, *M. J. Tobin,* County Attorney, and *Chas. A. Van Vleck* for the state.

GRANGER, J.—I. Prior to February 3, 1897, the defendant, Frank A. Novak, was a part owner of a stock of goods in a store at Walford, Iowa. He was a married man and carried upon his life an insurance of twenty-seven thousand dollars, mostly payable to his wife. On the afternoon and during the evening of February 2d, he was in company with one Edward Murray, some of the time in a saloon, and in the evening quite late, in defendant's store. That night the store of the defendant burned, and in the ruins was found what is supposed to be the body of Edward Murray. During that night defendant disappeared from Walford, and during the next day made his way to Iowa City, reaching there in the evening or night, and bought a ticket for Omaha, and from the latter place made his way to Seattle, in the state of Washingon, and from there to Alaska, and to the Klondike regions, where he was arrested at Dawson City, in the British possessions, on the 12th of July, 1897, by a detective and returned to Iowa. The indictment is for the murder of Edward Murray, and is in two counts, the first charging the murder to have been committed with a deadly weapon by beating and inflicting on him a deadly wound, and the second count charges the offense to have been committed by poisoning, mutilating, asphyxiating, burning, and other-

wise injuring the said Murray. The dead body when found in the basement of the building, was on a wire cot on a bank of coal deeply covered with ashes, charcoal, and debris, much charred, and the skull fractured on one side, with a clot of blood on the brain; the conditions being such that the expert testimony shows that the fracture was made while the person was still alive. Assuming the dead body to have been that of Murray, which the jury must have found, and that he came to his death by the defendant, the motive for the deed was thought to be to realize on his insurance, to accomplish which he killed Murray, and placed the body on a cot, on which defendant was accustomed to sleep in the store building, and placed the cot, with the body thereon, in the basement of the building, directly below where the cot stood when occupied by him (defendant); that he placed under or near the cot, with the body thereon, a pair of scissors and a metal identification check, which were known to be carried on the person of defendant, and which were found after the fire; that he then fired the building in order that the body might be burned so as to prevent identification, and then, by his own ecsape from the country, lead to the conclusion that the dead body was his, and thus secure the insurance. The arrest of defendant at Dawson City was by one Red Perrin, a detective, who was a witness for the state, and under objections he was permitted to state some admissions or declarations made by defendant on their way to Iowa, which may be properly stated in this connection as bearing upon the facts. Being told to state the substance of defendant's statements, the witness said: "To begin with he cited several hard luck stories in connection with his business up until the night of February 2d, his investment and unsuccessful outcome of money put into creameries, of his store being burned on another occasion, of having his safe burned up on one occasion, I believe in the Milwaukee depot, and again of having his safe blowed by robbers in his store and considerable money taken, didn't know the exact amount

himself, he said, but there was a good deal of it, and that as a
protection or further preventative from being robbed in this
manner he had procured a lot of morphine, or, rather, had
first sought the advice of some physician in Cedar Rapids, I
don't remember his name, as to the quantity of morphine he
ought to put into a bottle of whisky not to kill, but to knock a
man out. After this he went to a drug store in Cedar Rapids,
I don't recollect the drug store he mentioned either, and
procured this morphine, and at the same time told the clerk
what it was for. He later was in some saloon in Cedar Rap-
ids, and told some parties there what he had this poison for;
returning home from there he mixed this morphine with a
bottle of whisky; and I will condense this. There is an aw-
ful lot of it. It took him two hours to tell it to me, but I
will condense it. On the evening of February the 2d a man
named Edward Murray came into Walford in some kind of
a vehicle (a wagon, I think he said), and later came into,—
either came into Novak's store and Novak went with him to
a saloon and had a drink, or Novak went to the saloon and
met Murray there, I disremember which. Anyhow Murray
accompanied Novak back to the store. He said something
about some boys borrowing this wagon, or whatever it was,
to go riding, that Murray had driven into town. Also, prior
to this time he had told me that his circumstances was such
that he would have to raise some money; that he had already
made arrangements to raise five hundred dollars, or he tried
to; was going next morning, anyhow, to have an uncle of his
endorse a note, somewhere south of Walford,—I don't know
where it is, don't know his uncle's name,—and, with that end
in view, he had taken his shotgun, as he hunted quite often,
and got it ready, and his hunting coat in condition, and put
some lunch into it, and had it by in the store.  *  *  *
Coming back to the store again, when Novak and Murray re-
turned from the saloon, Novak went behind the counter, and
continued attending to his business. Murray remained out-
side, leaning against the counter. As to what time this was

I have no idea. I don't believe he was able to give the exact
time himself, or I don't think he did. And during this time
some few people were in and out of the store until it got
pretty late,—he thinks, in the neighbo...ood of 12 o'clock.
That he (Novak) went into the basement to fix the furnace
and bank it up, I think he stated for the night. Prior to this
time, though, he stated that he had put up this mixture of
whisky and morphine behind the counter on a shelf, and told
all the employes about the store what it was there for.* * *
Well, when he was coming up from the basement, and walk-
ing around behind the counter, after a lapse of a few minutes
he said that he addressed Murray and noticed that he an-
swered in a very stupefied manner, and it struck him at once,
he being a man that would take a drink when he got a chance,
that he must have gotten hold of this bottle. Upon going and
making an examination of the bottle, he seen that a very large
drink must have been taken out of it. He said that Murray
continued to get more stupid until he walked around the
counter, took hold of him and led him up to his room, and
laid him down on the bed, wherever that is. It is up stairs
some place in one end of the store or the other. I never saw
the store. And that he came down to the body of the store
again, that he must have been there a few minutes arrang-
ing his affairs, and then lay down on the counter with some-
thing under his head, reading, under a Welsbach burner, as
he described it. How long he read he doesn't know, but he
fell asleep, and what time he woke up he doesn't know—that
is, what time of night it was,—but whenever it was he found
the entire store filled with smoke and hot air, almost strang-
ling him. The first thing he thought of was Ed Murray asleep
on the upper floor. He stated that he made two attempts
to get hold of him, but the smoke and heat was pouring down
so hard that it was impossible,—couldn't do it under the cir-
cumstances—that he returned to the body of the store, made
his way to the money drawer, got some one hundred sixty
odd dollars—I forgot the exact amount—in silver. This he
dumped into his pocket, and, feeling his way out of the build-

ing along the counter, he ran against his shotgun. This he picked up and took with him. After getting outside of the building, he said that he walked around it, or part way around it a couple of times, determining what to do. He realized that Murray was in there, that he was heavily encumbered in various ways, and that he thought the best thing to do was to fall off the earth for a while, and that he started and kept agoing. He told me the course he took, the people he met, and everything connected with it all the way through but that part of it I did not pay much attention to, and that is known anyway, I guess. I don't recollect much about it." It further appears from the testimony of Perrin' that within a few minutes after defendant's arrest, which was done by British officers at Perrin's request, he (Perrin) approached defendant and addressed him as Novak; that defendant said to Perrin that he was mistaken, that his name was A. J. Smith; that Perrin then said to him, "It is, is it?" and Perrin further said: "You are accused of killing a man by the name of Ed Murray in Walford, Iowa, and that is why I had you arrested and, am holding you under arrest now; but, if you can identify yourself as A. J. Smith, why we will turn you loose." It then appears from the testimony that defendant denied having lived in Iowa, but said he was from near Cincinnati, Ohio, and had lived there prior to living in Chicago for a time. This arrest and talk was at Dawson City on the 12th day of July, 1897, and the admissions or declarations were made while going down the Yukon river on the 14th or 15th of the same month.

II. It appears that soon after the arrest on the 12th, shackles were put on the feet of defendant and kept on him on his way to Iowa, except between Dawson City and Ft. Cudahy, which distance was made in a small boat, there being with Perrin and defendant two other men, British policemen. By first settling the controversy as to admitting in evidence the statements of defendant, we may make easier the consideration of some other questions that

follow.  The parties are in dispute as to whether the state-
ments of defendant, as narrated in the evidence, are con-
fessions or mere declarations or admissions.  Inaccurate use
of such words as "confessions," "admissions," and "declara-
tions," has led to some confusion in the cases; but, on author-
ity and reason, there is a clear distinction between a con-
fession and an admission or declaration, unless the admission
or declaration has within it the scope and purpose of a con-
fession, in which its distinctive feature, as an admission or
declaration, is lost in the broader term "confession."    A
confession is a voluntary admission or declaration by a person
of his agency or participation in a crime.  See 6 Am. & Eng.
Enc. Law (2d ed.), 521.  The author cites numerous cases
in support of the definition, and among them *State v. Jones,*
33 Iowa, 9, where substantially the same definition is given.
To make an admission or declaration a confession, it must
in some way be an acknowledgment of guilt, and be so
intended, for it must be voluntary.  A mere admission or
declaration by a defendant against his interest is not neces-
sarily a confession.  This is true even though the admissions
are criminating.  See 6 Am. & Eng. Enc. Law, 522, citing
numerous authorities, and among them *State v. Knowles,*
48 Iowa, 598; *State v. Glynden,* 51 Iowa, 463; *State v. Red,*
53 Iowa, 69.  In the last cited case it is said:  "It will not
do to say that one on trial for a felony confesses his guilt
by admitting circumstances tending, however strongly, to
establish his guilt.  A confession of guilt is an admission
of the criminal act itself, not an admission of a fact or cir-
cumstance from which guilt may be inferred."  A ground
on which it is urged that the statements of defendant could
not be put in evidence is that they were obtained by fraud
and deceit.  It appears from the testimony of Perrin that,
after leaving Ft. Cudahy for St. Michaels Island, the
defendant admitted that his name was Novak, and desired
to make a statement to him of the facts, but did not want
it known publicly; until he had been before the grand jury,

and made the same statement to it, and there was an under-
standing on this subject; but its precise nature is not clear.
Perrin's statement is that neither he nor defendant was to
state it to others until such time, and that defendant first
told it, and then he did the same when he reached Benton
county, by telling the county attorney in presence of the
sheriff. It does not appear that Perrin in any way sought
the statements from defendant, but that defendant, after
telling his name and saying that Perrin had the right
man, stated that he wished to relate the circumstances con-
nected with the burning of Ed Murray, and asked Perrin if
he thought he would be permitted to go before the grand
jury and make the statement. Much stress is placed on the
fact that Perrin, after receiving the statements under an
agreement to withhold them until defendant had stated them
to the grand jury, violated the agreement by relating the
statements to the county attorney. Conceding all that
defendant claims for the agreement, and the breach of it,
in point of fact, and we see nothing to render the testimony
incompetent. What is called the "agreement" was merely an
acquiescence by Perrin in a wish of defendant. No induce-
ment whatever was held out to defendant to make his state-
ments, more than to say they would not be told before a
certain time. Had the agreement been observed, no one
could well say that all was not voluntary on the part of
defendant, for he proffered it all himself. There had been
no breach of agreement when he made the statement, and
hence the statement must have been as voluntary as it could
have been without the breach. Nothing was done to induce
fear of personal injury or hope of personal benefit. Even
as to confessions of guilt the rule is that "in order to exclude
the confession as involuntary, there must be some promises
or inducements made, or some injury threatened." *State v.*
*Fortner,* 43 Iowa, 494. In the same case we quoted the rule
from 1 Greenleaf on Evidence (section 219), as follows:
"The material inquiry is whether the confession has been

obtained by the influence of hope or fear applied by a third person to the person's mind." The reason for the rule excluding involuntary confession is not based on the thought that truth thus obtained would not be acceptable, but because confessions thus obtained are unreliable. The rule is in the interest of safe and reliable evidence. 6 Am. & Eng. Enc. Law, 526; *Fife v. Com.,* 29 Pa. St. 429; *People v. Ah Ki,* 20 Cal. 178; *Rutherford v. Com.* 2 Metc. (Ky.) 387; *Com. v. Cuffee,* 108 Mass. 285. Guided by such a rule, the breach of the agreement furnishes no reason for the exclusion of the evidence, because, as we have said, the statements preceded the breach. The essence of the rule is that when the confessions are made the conditions as to hope or fear are such as to make them unsafe as evidence. It is hardly possible to imagine in this case a reason for the application of the rule. There was nothing in the promise not to relate the facts, nor even in the breach of it, to induce an untrue statement. In *Fife v. Com., supra,* speaking of the admissibility of such declarations in evidence, it is said: "In such cases the chief question is whether the inducement held out to the prisoner was calculated to make the confession an untrue one, and, if not, it will be admissible." In *Rutherford v. Com., supra,* the court in considering the reason for and application of the rule, said: "And it has been decided that a confession is admissible even where it has been obtained by a deception practiced on the prisoner, or false representation made to him for that purpose, provided there is no reason to suppose that the inducement held out was calculated to produce any untrue statement. Thus, in a case where a prisoner had made a confession, after a representation made to him by a constable in the gaol that his accomplices had been taken into custody, which was not the fact, the confession so made was received as evidence against him. In these cases, however, there was no motive to induce the prisoner to make a statement which was not true, which in all such

cases is the main point to be considered." Looking at the statements of the defendant, it will be seen that they are far from being a confession of guilt, or admissions of fact from which guilt could be inferred. Few, if any, of his statements have even slight criminating force. The manifest purpose of his statements was to show himself innocent, and, if his statements are true, he is innocent of the crime charged; so that by no possibility could he have been induced, because of the promise of secrecy, to relate what was untrue, to his prejudice. Appellant apparently attaches much importance to the fact that the defendant when he made the statements was wearing shackles and in close confinement. The record fails to show undue severity in any form. His treatment was kindly, so far as the record shows, with no greater restraint or measures for security than the situation demanded, in view of the crime charged, the country in which they were, and the responsibility devolving upon the detective, then an officer with a requisition from the president for the return of the defendant.

The recent case of *Bram v. U. S.,* 168 U. S. 532 (18 Sup. Ct. Rep. 183),was decided in December, 1897. It is a quite exhaustive case on the subject, and because much reliance is placed on it by appellant we give the case a somewhat careful notice. A point made by appellant is that the admission in evidence of the statements of defendant was in violation of the fifth amendment to the constitution of the United States, which provides that no person "shall be compelled to be a witness against himself." In the *Bram Case* the proposition of the admissibility of involuntary confessions was considered from this constitutional standpoint. The syllabus of the case summarizes the conclusion so fairly that we copy from it as follows: "The mere fact that a confession is made to a police officer, while the accused is under arrest, in or out of prison, or is drawn out by his questions, does not necessarily render the confession involuntary; but,

as one of the circumstances, such imprisonment or interrogation may be taken into account in determining whether or not the statement was voluntary." The foregoing bears directly on the claim in this case as to the conditions under which the statements of defendant were made, he being in confinement and shackled. We quote again as follows: "Statements offered as a confession of murder held inadmissible where it appeared that they were made to a police officer, in the latter's office, no other persons being present, after the prisoner had been stripped of his clothing, and after the officer had said to him that his co-suspect had made a statement that he saw him commit the deed, and that the officer was satisfied that the prisoner had killed the deceased, that it was thought that he could not have done it alone, and, if he had an accomplice, he should say so, 'and not have the blame of this horrible crime on your own shoulders.'" To this the defendant said: "Well I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it." In that case the chief justice, with two of his associates, dissented, and, after referring to the answer above quoted, the dissenting opinion contains this language: "And here, it is argued, was a suggestion of a benefit,—the holding out of a hope that a full disclosure might somehow inure to his advantage. To support this contention involves a refinement of analysis which, while it may show marvelous metaphysical ability, is of little weight in practical affairs." With the radical difference of opinion in the court, we do not feel called upon to apply the conclusion in that case to a state of facts not in such precise accord as to come within its letter, unless in our judgment its merits, as a rule of law, entitle it to a broader scope. It will be seen that in the *Bram Case* the prisoner was persuaded or induced to make the statement by a holding out of a hope that a full disclosure might inure to his advantage. This case is widely different, because the statements were not in response to a request or suggestion

that he should make them, and what was said, furnished no
grounds whatever for hope or fear.  In the *Bram Case* there
is a collection of statements made to prisoners on which their
statements in return have been held involuntary, and we
notice some of them as showing that the language inducing
the statements is intended to induce hope or fear.  Each
quotation is from a different case: "You have got you foot
in it, and somebody else was with you.  Now, if you did
break open the door, the best thing you can do is to tell all
about it, and to tell who was with you, and to tell the truth,the
whole truth, and nothing but the truth."    "I don't think
the truth will hurt anybody.  It will be better for you to come
out and tell all you know about it, if you feel that way."    "If
you do so, it will go easy with you.  It will be better for you
to confess.  A door of mercy is open, and that of justice
closed,"—and threatening to arrest the accused and expose
his family if he did not confess.  "The suspicion is general
against you, and you had as well tell all about it.  The prose-
cution will be no greater.  I don't expect to do anything with
you.  I am going to send you home to your mother."
"Edmund, if you know anything, it may be best for you
to tell it."    "Edmund, if you know anything, go and tell
it, and it may be best for you."    "It will go better with you
to tell where the money is.  All I want is my money, and,
if you will tell me where it is, I will not prosecute you hard."
"It will be better for you to tell the truth, and have no more
trouble about it."    "You had better own up.  I was in the
place when you took it.  We have got you down fine.  This
is not the first you have taken.  We have got other things
against you nearly as good as this."    "You had better tell
the truth."    "It will be better for you to confess."    These
references are in the majority opinion, and made in support
of its conclusion, and it is quite significant that not a case
is found in which the prisoner's statement has been held
involuntary where it was not called out by language that
might induce hope or fear, which is at all times the basis for

excluding such statements. The *Bram Case* does not hold that voluntary statements are not admissible because of the constitutional provision, and there is no claim that it does. There is another reason why the *Bram Case* is distinguishable from this. Besides what has been before stated as to the conversation between the detective and Bram, the following appears: After Bram was stripped, the officer said: "Bram, we are trying to unravel this horrible mystery. Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder." Bram said: "He could not have seen me, where was he?" The officer said: "He states that he was at the wheel." Bram said: "Well, he could not have seen me from there." The court, in effect, holds that the language addressed to Bram produced upon his mind the fear that if he remained silent it would be considered an admission of guilt, and hence, because of such fear, he was compelled to answer.

III. It is said that, if the statements of the defendant are admissible in evidence, then the court's charge in reference thereto are erroneous. The court gave the following instruction: "Where the verbal admission of a person charged with a crime is offered in evidence, the whole of the admission must be taken together, as well as that part which makes for the accused as that which may make against him, and if the part of the statement in favor of the defendant is not disproved, and is not apparently improbable or untrue, when considered with all the other evidence in the case, then such part of the statement is entitled to as much consideration from the jury as any other part of the statement; but the jury is not obliged to believe or disbelieve all of such statement. They may disregard such parts of it, if any, as are inconsistent with the other testimony, or which the jury believe from the facts and circumstances proved on the trial are untrue." The defendant asked the court to instruct that the state was

bound by the statement of defendant as proved, the effect
of which was to declare him not guilty. We think the
instruction as given expresses the law. The idea that when
a party puts in evidence the statements of the opposite party
to obtain certain admissions he is bound to accept as true
all that may be contained in the statements is new, and, we
may add, somewhat novel. We understand the rule to be
that when the state puts such a statement in evidence it is
the province of the jury to consider what is proven to be true,
like any other evidence, whether it be the whole or a part.
The jury may believe that which is against the defendant,
and reject that which is in his favor, if they see sufficient
grounds in the evidence to warrant it, or any inherent
improbability in the statement itself. The jury is at liberty
to judge it, like other evidence, by all the circumstances of
the case. See *Jackson v. People,* 18 Ill. 269. In *State v.
Carlisle,* 57 Mo. 102, the court approved the substance of
the following instruction: "In considering what the
defendant said after the fatal act, the jury must consider
it all together. He is entitled to the benefit of what he
said for himself, if true, as is the state to the benefit of any-
thing he said against himself, in any conversation proved by
the state. What he said against himself the law presumes
to be true, because against himself. But what he said for
himself the jury are not bound to believe, because said in
a conversation proved by the state. They may believe it or
disbelieve it, as it may be shown to be true or false by the
evidence in the case." We are not to be understood as
quoting the instruction approvingly in all its parts. In 1
Greenleaf Evidence, section 218, it is said with other
language of like import on this subject: "The jury may
believe that part which charges the prisoner, and reject that
which is in his favor, if they see sufficient grounds for so
doing." The authorities seem conclusive of the question.

IV. A query in the case is, was the *corpus delicti* proven?
This means was Edward Murray murdered or criminally

killed? The fact is determinable from circumstantial evidence. The main facts are that the defendant was at the date of his death insolvent; that he carried about twenty-seven thousand dollars of insurance on his life; that he met with Murray on the afternoon of February 2d, and was with him in a saloon that afternoon and in defendant's store as late as half past 11 in the evening, when the two were seen there alone; that Murray was not seen alive after that; that the building burned that night, and the remains of a dead body were found in the debris, which the jury was warranted in finding was that of Murray; that defendant made his escape from the county that night mysteriously, and with no previous intention or preparation, and went to the Klondike regions; that when arrested there, and before he was told what it was for, he denied his name, and denied that he had resided or done business at Walford, Iowa; that he afterwards admitted that Murray was on a cot in the building on the night that it burned, and that he was there when the building was burning, and that he made no effort to save the building or Murray—that is, he does not say that he did in his statement of the facts; that the body of Murray was found on the cot in the basement on a bank of coal, under conditions to indicate that it was there before the fire occurred; that it appeared that the skull had been fractured before death, and in a way to cause death; and that under or near the cot were found articles belonging on the person of defendant, such as an identification check, and scissors, that likely would not have been there, except that they were placed there by design. The purpose of the identification check was, when worn by defendant, that, in case of accident, his body might be identified. Many minor details are in aid of the facts stated, and, when all are considered, the body of the offense is fully established.

V. As we have stated, the second count of the indictment charges the murder to have been committed by means of poison, and by mutilating, asphyxiating, burning, and other-

wise injuring the said Murray. On the trial the court took from the jury the question of the murder having been committed by poisoning, but submitted the question of its having been committed in the other ways charged in the count. It is now urged that after such withdrawal there was nothing left of the second count for submission to the jury, because there was no evidence to support it. It is true that the state makes an earnest contention that the crime was committed by the use of a deadly weapon, but such a claim is not exclusive, and the facts narrated as showing the offense to have been committed show a basis for the submission of the case to the jury, under the averments of the second count.

VI. E. L. Boies, Esq., was employed to, and did, assist the county attorney in the prosecution of the case, and made the closing argument to the jury. The validity of such employment and assistance is not questioned, except as to the making of the closing argument. Mr. Boies is not a resident of Benton county, and hence is said that he could not be an assistant county attorney of Benton county, and a reference is made to section 5372 of the Code, which prescribes the order of trial in criminal cases, as to reading of the indictment, and statement of the plea, the preliminary statements of counsel for the state and for the defense, and the order of presenting the evidence, after which the section provides: "When the evidence is concluded, unless the case is submitted to the jury on both sides without argument, the county attorney must commence, the defendant follow by one or two counsel, at his option, unless the court permit him to be heard by a larger number, and the county attorney conclude, confining himself to a response to the argument of defendant's counsel." It is thought, because of this language, the county attorney being specified, that none but a county attorney can participate in the argument to the jury on behalf of the state. The same section says: "The

clerk or county attorney must read the indictment and state the defendant's plea to the jury." That language is just as mandatory as that in regard to the argument being made by the county attorney, and in *State v. Crafton,* 89 Iowa, 109, where an attorney had been employed by private parties to assist the county attorney, and read the indictment to the jury, we held that in so doing he was acting as county attorney, and that there was no error in his so doing. We think, in the use of the term "county attorney" in the section, the legislature intended no more than to specify the legal representation of the state on the trial, whether the county attorney in fact, or one who was legally assisting him.

VII. It is claimed that the skull of Edward Murray should not have been admitted in evidence because not properly guarded or kept so as to preserve it from interference. It is true that the body lay in the house of his father for a day or two, and that persons were in and out; that it was buried, and after some days exhumed, and the skull taken from it, and it was in the possession of different ones such as the county attorney and the doctor, and was not at all times under lock and key and absolutely safe from interference; but it was so kept, we think, as to be reasonably safe therefrom. In fact, the record is such a disclosure as to put the matter beyond a doubt that the skull when in evidence was in the condition in which it was found after the fire, in every essential particular.

VIII. What is known in the record as a St. Joseph's cord was put in evidence by the state as a means of identifying the body as that of Edward Murray. The cord is one of religious significance in the Catholic Church, of which church Murray was a member. Such a cord was given Murray in 1892, and he was known to wear it after that, but how long does not appear from any direct evidence. It does appear that they are worn through life for special protection and for some particular assistance they are at

death.   It also appears that it is a custom in the church for members, after putting on these cords, to wear them through life.   With it established that Murray was a Catholic, the presence of the cord on the body would have some tendency to show the identity of the body as his, if no further than that it was the body of a Catholic, which would be one link in the chain.   There was also put in evidence some pieces of a shirt shown to have been taken from the body.   The testimony of a sister of Murray shows that she took the pieces from the body, and that she gave her brother a shirt of similar material, and she thought the pieces were a part of the shirt she gave him.   It was further shown that when Murray left home on February 2d he had on such a shirt.   There was no error in admitting in evidence either the cord or pieces of the shirt.   There are some other questions as to the admissions of evidence, but they present no doubtful questions, and we need not further refer to them.

IX.   After deliberation, the jury returned into court, and presented a verdict as follows: "We, the jury, find the defendant guilty of murder in the second degree, and that his punishment be imprisonment in the penitentiary for ten years at hard labor."   The court said to the jury that its verdict was not in proper form, and could not be received, and directed the form that should be used if it found defendant guilty in that degree, and said to the jury that if it made any recommendation it should be separate from the verdict.   The jury retired, and brought in a verdict of murder in the second degree, and, separate from it, a request that the punishment be ten years in the penitentiary. The verdict as first returned was not entered in the record, except that the court reporter entered it in his minutes; but a request for it to be entered in the record was made by the defendant.   It is now contended that the first verdict was complete, under the forms given by the court, and that the part as to the punishment was surplusage, and that the

entering of a verdict in the minutes of the reporter was "a taking of a verdict by the court, and when thus entered by the reporter upon the proceedings it became a verdict received and entered by the court," and that the jury had no further power or jurisdiction in the matter. Appellant relies on section 3675 of the Code to sustain the claim that the entry by the reporter in his minutes made the verdict first returned a "verdict received and entered by the court." A careful reading of the section shows a different legislative intent. The section particularizes the duties of the reporter, and they are numerous; but such acts are not made parts of the record until certified, and when certified they only bring into the record what would not otherwise be there, and constitute a bill of exceptions. It is just as much the duty of the reporter to enter in his minutes the return of an improper as of a proper verdict, and he is required to note the action thereon. The object of the reporter's report—and the law designates it as a report—is to obtain one of the proceedings of the trial in a way, if it should become necessary, to make it a part of the record for review. It is of no force as a record until certified; and it is only certified upon demand of a party. The law provides of what the records of the court shall consist; they being the original papers filed in all proceedings, and certain specified books, and they are to be kept by the clerk. Code, sections 287, 288. In no proper sense can it be said that the first verdict was received, but, on the contrary, it does appear that the court declined to receive it because of the recommendation included in it. As we understand appellant, the first and last verdict are of precisely the same legal force on their face. If we conclude as much, the question comes to us, what is the effect of requiring the jury to retire to further consider its verdict? Had it not retired, the verdict would, in legal effect, have been as it is now. If there was error at all, it was in not receiving the first verdict. The result is precisely the same, notwithstanding the error. The most

that can be said is that it is a technical error or defect in the form of procedure, and clearly without prejudice. Section 5462 of the Code requires that we should disregard technical errors or defects, and render such judgment on the record as the law demands, affirming or reversing the case. It should not be understood that we hold the act of the court to be erroneous. It is only necessary to say that the act claimed as error was absolutely harmless, and without prejudicial effect to any one. There is a contention that when the jury retired for deliberation the second time it could have returned a verdict of murder of the first degree or of manslaughter, because of which it is thought there was prejudice. It is not easy to see how prejudice could result from something that never happened. It is as certain as anything could well be that the jury retired and took from its verdict as before returned the recommendation, or what appellant calls "surplusage," and then returned the verdict it had returned before. In the case of *State v. Tweedy,* 11 Iowa, 350, the court put the defendant on trial for a crime of which he had been acquitted, and that was held to be prejudicial error, even though the verdict was manslaughter. It is easy to see how such a proceeding might be prejudicial. The prejudice there was not from what the court might have done but did not do, but from what was actually done. The action of the court was to avoid an improper verdict in form, and its action in that respect is to be approved and commended. In *People v. Jenkins,* 56 Cal. 4, it is said: "It is the duty of the lower court to look after the form and substance of a verdict, so as to prevent a doubtful or insufficient finding from passing into the records of the court. For that purpose the court can at any time while the jury are before it and under its control see that it is amended in form so as to meet the requirements of law."

X. The court in its instructions withdrew the charge of killing Murray by means of poison, because of insufficient evidence to sustain it, and permitted the jury to consider

whether the defendant did kill Murray by the other means specified in the second count of the indictment. It is urged that the withdrawal of the charge of killing by poison was error, and it is said that the court withdrew the strongest and most convincing proof of manslaughter, and practically took from the jury the evidence that would support such a finding. We need but say that a verdict of manslaughter, based alone on the evidence of poisoning, would have been without support, and it was not the duty of the court to permit or even give to the jury an opportunity to so find improperly, in the interest of saving the defendant from a verdict of a higher degree of crime.

XI. The following, with some omissions, is the twenty-third instruction given by he court: "You are further instructed as a matter of law that, where a conviction for a criminal offense is sought upon the circumstantial evidence alone, the state must not only show by a preponderance of the evidence that the alleged facts and circumstances are true, but they must be such facts and circumstances as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis, other than that of the guilt of the accused. And in this class of cases the jury must be satisfied, beyond a reasonable doubt, that the crime has been committed by some one in manner and form as charged in the indictment, and then they must not only be satisfied that all the circumstances proved are consistent with the defendant having committed the act, but they must also be satisfied that the facts are such as to be inconsistent with any other rational conclusion than that the defendant is the guilty person. It is your first duty to determine from the evidence what facts and circumstances are thereby established, and then to draw from such facts and circumstances, after carefully examining and weighing them, your conclusion as to the guilt or innocence of the defendant. It is your duty to exercise great care and caution

in drawing conclusions from proved facts. They should be fair and natural, and not forced and artificial, conclusions, and all the facts and circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the accused, and no one else, committed the offense charged. It is not sufficient that they create a probability, though a strong one, and it, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential therefore that the circumstances, taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis. If then all the facts and circumstances established by the evidence beyond a reasonable doubt cannot be reconciled with any reasonable hypothesis of the defendant's innocence, but do concur in showing the defendant's guilt, and, when taken together, are sufficient to prove beyond reasonable doubt the guilt of the crime charged in the indictment, or any other crime included therein, then you are instructed that it is your duty to convict the defendant of the crime so established." The criticism upon the instruction arises largely from the use of the words "preponderance of evidence" in the first part of it, because of which the instructions on the weight of evidence necessary to convict are said to be conflicting to such an extent as to be prejudicial. Not read with a view to criticism, there is little difficulty in harmonizing all parts of the instructions on this subject. The clearly manifest purpose of the court throughout its instructions to preserve the rights of the defendant against prejudice by a conviction on an undue weight of evidence is so plain as to be beyond peradventure. In *State v. Hayden,* 45 Iowa, 11, we held that: "It is not a reasonable doubt of any one proposition of fact in a case which entitles to an acquittal. It is a rea-

sonable doubt of guilt arising upon a consideration of all the evidence in the case." See, also, *State v. Felter*, 32 Iowa, 53. The proposition has wide, if not general, support on authority. *Clare v. People*, 9 Colo. 122 (10 Pac. Rep. 799); *Mullins v. People*, 110 Ill. 42; *Leigh v. People*, 113 Ill. 372; *Bradshaw v. State*, 17 Neb. 147 (22 N. W. Rep. 361). Looking to the language of the instruction under consideration it will be seen that the purpose of that part of the instruction was rather to guard against the effect of facts found by a preponderance of evidence, than to permit a conviction upon facts so found, unless the facts, when found, are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused. Later in the same instruction it is said: "If then all the facts and circumstances established by the evidence beyond a reasonable doubt cannot be reconciled with any reasonable hypothesis of the defendant's innocence, but do concur in showing the defendant's guilt, and, when taken together, are sufficient to prove beyond a reasonable doubt the guilt of the crime charged in the indictment,   *   *   *   then you are instructed that it is your duty to convict." In another instruction the court, after specifying the material facts of the indictment, said to the jury: "The court instructs the jury that in this case the burden of proof rests upon the prosecution to make out and prove to the satisfaction of the jury, beyond every reasonable doubt, every material allegation in the indictment, and, unless that has been done, the jury should find the defendant not guilty." It will thus be seen that the court has specifically referred to the allegations of the indictment, and required that they should be proven to the satisfaction of the jury beyond every reasonable doubt, and has then referred to "all the facts and circumstances," and has said that a conviction could only be had when they are established by the evidence beyond a reasonable doubt, so as not to be reconcilable, upon any reasonable hypothesis, with the defendant's innocence. It seems to us that the language in

the instruction we are considering, as to what should not be the effect of facts shown by a preponderance of evidence, does not obscure the force of such instructions, or present a prejudicial conflict.  The instructions throughout, barring the single statement, make the rule as to a reasonable doubt so prominent that we do not think the jury could have entertained the least doubt on the subject.  The case is essentially different from that of *State v. Cohen,* 108 Iowa, 208.  In that case the court instructed that the state was not required to prove each link in the chain of evidence relied on to establish the defendant's guilt beyond a reasonable doubt. That instruction was held to be erroneous for the reason that no chain could be stronger than its weakest link.  In that case we approved of the rule announced in *State v. Hayden* and *Clare v. People, supra,* and we further said that, "if the jury could have understood from the phrase 'link in the chain of circumstances' that such fact or circumstance was referred to as might tend to establish the ultimate facts and circumstances upon which conviction depended, then, though not approving the use of metaphors in instructions, an exception would not be well founded."  Now, while the first part of the instruction quoted is inaccurate, and ought not to have been given, yet taken in connection with what follows, and with the other instructions given by the court, it clearly appears that the jury could not have been misled.  In reviewing an instruction the first question to be solved of course is, what idea was conveyed by it to the jurymen?  *People v. Hamilton,* 62 Cal. 377.  We have no doubt that they fully understood from the instruction under consideration that every fact and circumstance necessary to the defendant's conviction must be established beyond a reasonable doubt. Nothing that we have here said is in conflict with the rule announced in *State v. Clark,* 102 Iowa, 688.  In that case the construction complained of permitted a conviction of the acts complained of as constituting the offense being proven by a preponderance of the evidence.  It is true that the correct rule was stated in another instruction, but it could

not be told what rule the jury followed. Here there is no real conflict in the instructions.

XII. The court gave the following instructions: "You. are instructed that every person is presumed to be sane and rational, unless the fact is proven otherwise by a preponderance of the evidence, and you are to treat the acts of the defendant at and subsequent to the fire, as shown by the evidence, as the acts of a sane and rational man, unless the evidence shows, not only a possibility, that his mental condition was otherwise, but further shows, by a fair preponderance of the evidence in the case, that the defendant was then in fact irrational or suffering from mental aberration of the mind. You are not required to find that the defendant was irrational or insane at such time, unless the evidence clearly establishes such fact, and should only find him insane or irrational at the time of the fire and subsequent thereto, upon evidence of a reliable character, which convinces you that such fact is proven by a fair preponderance of all the evidence in the case bearing thereon." The character of the criticisms on the instruction will be seen by a reference to them. Take the first sentence of the instruction, and it will be seen that the word "possibility" is used, and also the words "a fair preponderance of the evidence." The criticism of the instruction makes it mean that, to establish mental aberration, "it takes possibility, plus a fair preponderance of evidence." The instruction plainly says that, "to show mental aberration, or unsoundness of mind, it is not enough to show a possibility of the fact, but the evidence must go further, and show the fact by a fair preponderance." In the other sentence of the instruction the words "clearly establishes such fact" are construed by appellant to mean, by the connection in which they are used, that the insanity must be established beyond a reasonable doubt. In *People v. Hamilton, supra*, in considering the weight of evidence to establish insanity, and in passing upon an instruction in which the words "clearly established" were used, it is said: "In the connection in which they are used, to say that insanity

must be clearly established, is not to say that the evidence must more than preponderate, but only that the preponderance must be plainly apparent." In *State v. Felter*, 32 Iowa, 49, it is said that the fact of sanity cannot be avoided, it being in the nature of an affirmative defense, "except by a preponderance of proof, or (which is the same) satisfactory evidence of his sanity." That preponderance which amounts to satisfactory evidence of a fact must be such as clearly establishes the fact. We discover no error in the instruction.

XIII. There are complaints as to instructions asked and refused. We have given them full and fair consideration. Some of them express the law in a way that they could well have been given, and others are clearly erroneous. Thoes given by the court so embrace the substance of those asked that, properly expressed, the law that the defendant was not in any way prejudiced. The evidence, though circumstantial, is of a character to show the guilt of the defendant. The facts are not reconcilable on any other reasonable hypothesis. The innocence of the defendant is only consistent with a disregard of important facts in the case. The judgment of the district court is AFFIRMED.

WATERMAN, J., (dissenting).—I think the judgment should be reversed for error in the twenty-third instruction set out in the eleventh division of the foregoing opinion. It is not enough to say that this paragraph of the court's charge will bear the construction given it by the majority, unless we can also say that no other construction prejudicial to defendant is warranted. If the language used might reasonably have been interpreted by the jury, as announcing a rule of law erroneous in principle, and calculated to prejudice defendant's case, then the instruction should be disapproved, and a new trial awarded. The first sentence of this instruction may fairly be said to announce this rule: If the character of the circumstances is such that, if true, every reasonable hypothesis of innocence is excluded, the truth or existence of such circumstances may be established by a preponderance of evidence. That the language is susceptible of this

meaning seems clear, and that it is the meaning most likely to be accorded it is shown by the fact that counsel for the state so construe it. This is not a correct statement of the law. While each circumstance, when independently considered, need not be established beyond a reasonable doubt, yet when all the circumstances are taken together, the existence of every essential one must be shown by that degree of proof, in order to warrant conviction. There may be but slight independent evidence of some circumstances, but, when filed into their proper places in the case of the state, these facts when of an essential character, must derive such support from other facts in evidence as to make their existence clear to the exclusion of all reasonable doubt. When thus established, the circumstances, taken in combination, must not only be consistent with guilt, but they must be inconsistent with any rational theory of innocence, in order to make a case for conviction. *State v. Cohen* 108 Iowa, 208; *Bradshaw v. State,* 17 Neb. 147 (22 N. W. Rep. 361); *Sumner v. State,* 5 Ind. 579; Burrill Circumstantial Evidence, 136. The learned text writer just cited states the law as follows: "The party upon whom the burden of proof rests is bound to prove every single circumstance which is essential to the conclusion in the same manner and to the same extent as if the whole issue rested upon the proof of each individual and essential circumstance." If it can be said that in other parts of the charge a different and correct rule is stated, it is obvious that such a contradiction must have been calculated to mislead the jury. But I am not prepared to admit that there is anything in the instructions which tends to show that the language under consideration should not be construed as above suggested. While it is elsewhere said that the case of the state is to be made beyond a reasonable doubt, it is in the opening sentence of the twenty-third instruction alone that the jury is told how this may be done. Mr. Justice Ladd joins me in saying that, for the reasons given, judgment of the trial court should be reversed.