Moore, Plaintiff in error, vs. The State, Defendant in error.

*January 10—February 4, 1936.*

*Jerome F. Treis* of Milwaukee, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, *William A. Zabel,* district attorney of Milwaukee county, and *William J. McCauley,* assistant district attorney, and oral argument by *Mr. McCauley.*

WICKHEM, J. There are two assignments of error: (1) That the evidence does not sustain a verdict of murder in the first degree; (2) that the trial court in its instructions erroneously referred to certain written admissions by defendant as confessions, and that this constituted prejudicial error.

On May 17, 1934, one John Schill was shot and instantly killed. Schill was a horse trader in Milwaukee and maintained his barns at a distance of about a block from his residence. On the lot adjoining the barn, Schill had an office

and sleeping quarters for his stablemen. The barn and office could be seen from his home. On the date in question, Schill made a trip out of town for the purpose of buying horses. He had with him about $800 in cash which he carried in a large purse. He bought some horses for which he paid about $350 and returned home about 8:40 p. m. of the same day. He went to the barn and thence to his home, arriving home about 9 o'clock. At about 9:15 someone called at the Schill home and asked to see some horses. Schill went to the barn with the caller. At 11:45, when Mrs. Schill retired, Schill had not returned to the house. About 6:30 the next morning Schill was found dead. He was lying on the barn floor, and an examination disclosed that he had been shot. After some investigation defendant was suspected and questioned by the police and district attorney. During the course of this questioning defendant made certain statements to which the second assignment of error relates.

Defendant was the owner and proprietor of a tavern in Milwaukee. He was acquainted with Schill and claims to have shot dice with Schill on at least one occasion. Defendant testified that at the time of this game Schill borrowed $35 from him; that he called on Schill several times to collect this amount; that Schill stated that he was not in funds and requested defendant to return later; that on the occasion in question he came to the barn for the same purpose; that Schill was working at the end of the barn opposite the door; that defendant walked down the aisle between two sets of stalls and spoke to Schill; that, when Schill recognized defendant, he ordered him out and started after him with a pitchfork; that defendant thereupon stepped into one of the side stalls to avoid the pitchfork and shot Schill.

Defendant's statements to the police and district attorney were materially different from his testimony upon the trial. They were to the effect that defendant had known Mrs.

Schill for some time prior to the killing; that on one occasion shortly before the homicide, when defendant had been arrested for selling liquor without the proper stamps, Mrs. Schill had loaned him the sum of $300; that she had told defendant that she wanted to be rid of her husband; that she had intimated that he customarily carried large sums of money, and that whoever killed him would probably find several hundred dollars on his person; that there was also an understanding, tacit or express, that if defendant killed Schill, he would not need to return the $300 previously borrowed from Mrs. Schill; that defendant borrowed a gun and went to the barn on the occasion of the shooting for the purpose and with the intention of killing Schill and robbing him; that, when he arrived at the barn, Schill ordered him out and attacked him with a pitchfork; that he then shot Schill; that, while he went to the barn for the purpose of killing Schill, he might not have had the nerve to do it had not Schill come after him with the pitchfork; that after killing Schill, defendant took Schill's purse, which he claims contained only a small sum of money in silver. Aside from these statements, there is evidence that defendant showed signs of sudden prosperity after the killing and that he had in his possession large sums of money.

The evidence is amply sufficient to sustain the jury's verdict of murder in the first degree, and it is unnecessary to recite in detail other corroborating circumstances. The jury was entitled to conclude that the rather mild assertion that defendant ultimately acted in self-defense was an afterthought. The physical facts with respect to the location of the body after the shooting give very little comfort to the defendant and no corroboration to his claims. If defendant is to be believed, the deceased was working at the opposite end of the barn when he approached. Deceased advanced toward the defendant with a pitchfork. The defendant

stepped into the second stall, the extreme partition of which was some seven feet from the outer wall of the building which constituted the end of the barn, and shot twice. The bullets entered, respectively, behind the ear just to the rear of the mastoid process and the back of the head. The direction of each bullet was toward the front of the deceased's head, indicating that the deceased was shot from the rear. If defendant is to be believed, he shot as deceased lunged at him and passed him, but it is an established fact that the body of deceased was lying on its back in close proximity to the end of the barn from which deceased had advanced. According to defendant's testimony, deceased must have been at least seven feet from the end of the barn and moving away from it when he was shot. There is also testimony that the pitchfork was hanging in its proper place on the wall when deceased was found. In view of the position of the body after the shooting and the location of the bullet wounds and the evidence relating to the pitchfork, the jury could properly reject defendant's testimony that an altercation occurred.

It is next contended that the court erred in its instructions to the jury in denominating statements made to the district attorney and to the police as confessions. These statements were elicited by question and answer, stenographically reported. The court said in its instruction:

"Evidence has been received as to certain statements made by the defendant to the police and to the district attorney, and typewritten statements have been received in evidence and have been read to you. The mere fact that a confession was made without the accused having been informed as to his constitutional rights, or without the accused having been cautioned or warned that such statements might be used against him, does not render such confession unworthy of credit, if otherwise credible. The mere fact that statements were made or elicited while the accused was in custody or confinement or under arrest does not of itself render the statements unworthy of credit, if otherwise credible, or

stamp them as involuntary statements, or as given under duress."

It is claimed that these statements were admissions, not confessions, and that it was prejudicially erroneous to refer to them as confessions.

It is the defendant's contention that the portions of the statement detailing an attack by deceased upon defendant constitute exculpatory matter that destroys the effect of the statement as an admission of guilt. With this contention we are unable to agree. In *State v. Novak*, 109 Iowa, 717, 79 N. W. 465, it is said: .

"Inaccurate use of such words as 'confessions,' 'admissions,' and 'declarations' has led to some confusion in the cases; but, on authority and reason, there is a clear distinction between a confession and an admission or declaration, unless the admission or declaration has within it the scope and purpose of a confession, in which its distinctive feature, as an admission or declaration, is lost in the broader term 'confession.' A confession is a voluntary admission or declaration by a person of his agency or participation in a crime. . . . To make an admission or declaration a confession, it must in some way be an acknowledgment of guilt. . . ."

We are of the opinion that the statements made to the police are sufficient, standing alone, to warrant defendant's conviction of first degree murder in spite of the inclusion therein of exculpatory statements. In substance, the statements set forth an agreement or understanding between defendant and Schill's wife that defendant murder Schill; the motive being cancellation of a loan made by Mrs. Schill to defendant and the securing of such sums as defendant might find upon the person of deceased; that defendant went to the · barn for the purpose of killing deceased, and that he did kill him and rob him. The exculpatory portions of the statement are to the effect that defendant might have lost his nerve had the deceased not attacked him with a pitchfork.

The jury was not only entitled to disbelieve this portion of the statement, but, even if it were true, the jury was not compelled to believe that defendant, who had gone to the barn for the express purpose of killing and robbing Schill and who accomplished both purposes, deviated from his original purpose by reason of the conduct of the deceased. The jury had a right to conclude that, while such conduct, if it occurred, might have fortified defendant in his original purpose, the act of shooting was in pursuance of the original scheme.

It is, of course, obvious that a statement denying guilt cannot constitute a confession. It is equally obvious that the mere statement that defendant was attacked by deceased did not so qualify the whole statement as to render it a denial of guilt. This being true, we think the statement was properly referred to as a confession. Even if this were not true, it would be difficult to find that a statement so obviously open to the inference that defendant was guilty of murder in the first degree could be designated a confession with any resulting prejudice to the defendant.

*By the Court.*—Judgment affirmed.