[Crim. No. 782.   Second Appellate District, Division Two.—September 26, 1921.]

# THE PEOPLE, Respondent, v. LOUISE L. PEETE, Appellant.

[1] CRIMINAL LAW — APPEAL — PROVINCE OF COURT.—The appellate court sits in criminal cases solely for the correction of errors of law, and if there is any substantial evidence upon which the verdict may find meritorious support, the court will not disturb the jury's determination, even under a claim that there is conflicting evidence which might have raised a reasonable doubt of the guilt of the defendant, since it is the peculiar and exclusive province of the jury to weigh the evidence and pass upon the credibility of witnesses, and their finding cannot be disturbed on the ground of insufficiency of the evidence unless there is a total deficiency in the evidence or unless it preponderates so clearly against the verdict as to render it clear that the jury must have been under the influence of passion or prejudice.

[2] ID.—MURDER—CIRCUMSTANTIAL EVIDENCE—GUILT OF DEFENDANT— RIGHT OF JURY.—Where the evidence in a prosecution for murder is entirely circumstantial, and no claim of any mitigating circumstances, justification, or excuse for the killing is advanced by the accused, the jury, from the nature of the wound inflicted, from the character of the weapon which the nature of the wound indicates was used, from the acts and conduct of the accused, and all the attendant and surrounding facts, may infer that the deceased was unlawfully killed by the defendant, with malice aforethought, as the result of a deliberate and premeditated purpose to kill, and, so inferring, the jury, under such circumstances, may be warranted in returning a verdict of murder in the first degree.

[3] ID.—DEGREE OF CRIME—QUESTION FOR JURY.—The question of the degree of the crime in a prosecution for murder is exclusively for the jury, and their determination will not be disturbed when there is any evidence to support it.

[4] ID.—MURDER IN FIRST DEGREE — SUFFICIENCY OF EVIDENCE.—In this prosecution for the murder of a person whose body was found buried in a closet under the staircase in the basement of his residence, the circumstances disclosed by the evidence are held to be ample to support the inference that the killing was unlawful, was done with malice aforethought, and was willful, deliberate, and premeditated.

[5] ID.—CAUSE OF DEATH—SUFFICIENCY OF EVIDENCE.—It is also held herein, in view of the conflict in the theories offered by the medical experts as to the cause of death, it cannot be contended that

the theory of the state that death was caused by a gunshot wound, and not by strangulation, is not sustained by the evidence.

[6] ID.—THEORY OF DEATH—SILENCE OF INDICTMENT—RIGHT OF JURY. Where in a prosecution for murder the indictment does not state the manner or means of death, the state can advance any reasonable hypothesis as to the cause of death, and the jurors are free to adopt such theory as, in their judgment, is most in accord with a reasonable interpretation of all the incriminatory circumstances in the case.

[7] ID.—EVIDENCE — INCRIMINATORY CIRCUMSTANCES — POSSESSION OF ARTICLES OF DECEASED.—Possession by the accused shortly after the homicidal death, of articles known to have belonged to the deceased under circumstances that would justify the inference of larceny, is sufficient to establish the guilty agency of the accused, especially when coupled with her false statements as to the whereabouts of the deceased.

[8] ID.—CONCEALMENT OF BODY.—It is one of the badges of guilt to attempt concealment of the act done, and where a homicide has been committed and the body is concealed, it is a legitimate inference therefrom that the person who concealed the body is connected with the crime as author or participator.

[9] ID.—IDENTITY OF BODY OF DECEASED—EVIDENCE.—Direct or positive proof as to the identity of the body of a murdered man is not required, and where the body has been badly burned, mutilated, or decomposed, identity may be established by articles of clothing and other personal belongings found on or near the body, especially where the accused has made false statements in attempt to account for the disappearance of the deceased.

[10] ID.—IDENTIFYING CIRCUMSTANCES — QUESTION FOR JURY.—Where the body is identified by the clothing and articles found thereon, it rests exclusively to determine, from all the evidence, what weight to give to such identifying circumstances, and if there is a conflict in the evidence, their determination is conclusive on the appellate court.

[11] ID.—MEANS OF DEATH — REVOLVER FOUND IN CLOSET — ADMISSIBILITY.—Where in such prosecution there was evidence of an aperture in the neck of the deceased about the size made by a 32 or 38 caliber bullet, it was not error to admit in evidence a 32-caliber revolver containing five loaded and one empty shell which was found on a shelf of a closet in a room on the second floor of the residence of the deceased.

---

8. Attempt to dispose of or conceal dead body as evidence connecting accused with homicide, note, 2 A. L. R. 1227.

9. Sufficiency of circumstantial evidence to identify remains found as those of person charged to have been killed, note, 7 L. R. A. (N. S.) 181.

[12] Id.—Remoteness of Discovery of Revolver—Matter Affecting Weight.—Objection that the time of the discovery of the pistol was too remote from the date of the crime, or that the defendant was not in the actual occupancy of the premises at the time of the discovery, or that there was a possibility that unknown persons may have visited the house in the meantime, goes to the probative force of the evidence, but does not affect its admissibility.

[13] Id.—Statements of Defendant — Phonographic Reporter's Transcription.—In such prosecution, it was not error to permit to be read to the jury the phonographic reporter's transcription of statements made by the defendant in the presence of the deputy district attorney and others, where the reporter testified that he took accurate shorthand notes of all that was said and that his transcription thereof was correct.

[14] Id.—Explanation of Suspicious Circumstances—Admissibility. Declarations of the defendant to the deputy district attorney consisting of explanations of suspicious circumstances which, if not explained satisfactorily, would naturally tend to point more or less conclusively to the defendant as the guilty agent, and which when compared one with another and when considered in connection with the facts established by the sworn witnesses appear to have been disingenuous fabrications to ward off suspicion, were admissible.

[15] Id.—Nature of Statements — Admissions.—Statements of the defendant of what she claimed to be her own conduct after she met the deceased and of what she claimed to be the facts surrounding his disappearance were only admissions, and not a confession, and were admissible without any prior evidence of their voluntary character, where in no part of such recital did she state or admit that she had done any wrongful or unlawful act.

[16] Id.—Uncertainty as to Date of Death—Effect of.—The admissibility of such statements was not affected because the precise date of the death was not shown and therefore some of the narrated facts may have occurred before the homicide, since all the facts were part of the one statement, and so interrelated as to make the same an entire and connected one bearing on the same subject matter.

[17] Id.—Accusatory Questions by District Attorney—Effect of Such statements were not rendered inadmissible because they did not consist alone of declarations made by defendant, but were in part made up of accusatory questions propounded by the district attorney.

[18] Id.—Instruction—Accomplice—Evidence.—Where there was evidence to justify a finding that the deceased had been murdered and that defendant was concerned in the commission of the crime as a guilty agent, it was proper to instruct the jury upon the law

applicable to an accomplice, although there was no direct evidence as to the manner or cause of death, since it is the duty of the court under section 1127 of the Penal Code to charge the jury as to all matters of law necessary for their information.

[19] ID.—INSTRUCTION ON ISSUE—POSITIVE TESTIMONY NOT REQUIRED. To justify an instruction on an issue raised by the evidence, positive testimony is not required, and it is sufficient if the fact may reasonably be inferred from circumstances proved.

[20] ID.—DEGREES OF MURDER — SPECIAL INSTRUCTION — WHEN UN-NECESSARY.—In a prosecution for murder, the refusal to give an instruction that if the jury found the defendant guilty of murder it was its duty to determine the degree was not prejudicial, where the court in its general instruction upon the subject of homicide clearly defined and distinguished the two degrees of murder and advised the jury that it was left to them to determine, from all the evidence before them, the degree of the crime.

[21] ID.—SPECIAL INSTRUCTION—MATTER COVERED BY OTHER INSTRUCTIONS.—It is not error to refuse to give a special instruction in itself unobjectionable if it has already been covered properly and sufficiently by other instructions comprehensive enough to embrace the whole law applicable to that branch of the case.

[22] ID.—PLACE OF CRIME—SUFFICIENCY OF EVIDENCE.—Evidence that the body of a murdered person was found in the basement of his house which he had leased to the defendant was sufficient in the absence of explanation to justify the jury in finding that the homicide was committed in the county in which the house was situated.

[23] ID.—VENUE — PROOF BY CIRCUMSTANTIAL EVIDENCE.—Venue may be established by circumstantial evidence.

[24] ID.—ALTERNATE JUROR—CONSTITUTIONAL LAW.—Section 1089 of the Penal Code, providing for an alternate juror, does not impair any of the essential attributes of a trial by jury guaranteed by section 7 of article I of the constitution.

[25] ID.—TITLE OF ACT PROVIDING FOR ALTERNATE JUROR—SUFFICIENCY OF.—The act whereby section 1089 of the Penal Code, providing for an alternate juror, was added to the code is not violative of the constitutional requirement that every act shall embrace but one subject, which subject shall be expressed in the title.

[26] CONSTITUTIONAL LAW—REVISION OF LAW—ESSENTIALS.—An act is not revised nor a section amended, within the purview of the inhibition of section 24 of article IV of the constitution, by an act which adds a new code section and does not purport to repeal or amend any of the sections of the code to which it is added, since by section 24 of article IV of the constitution no law shall be revised or amended by reference to its title, but in each case the act revised or section amended shall be re-enacted and published at length as revised or amended.

[27] STATUTORY CONSTRUCTION — IMPEACHMENT.—The validity of a statute which has been duly verified, enrolled, approved, and deposited in the office of the Secretary of State cannot be impeached by a resort to the journals of the legislature or by extrinsic evidence of any character whatever.

[28] CRIMINAL LAW — REMARKS OF DISTRICT ATTORNEY — REVERSAL.— Unless a defendant objects to improper remarks by the district attorney and requests an instruction that the jury disregard them, a reversal of judgment will not be made unless the misconduct is so flagrantly prejudicial that neither a retraction nor a rebuke from the court can destroy its influence.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Frank R. Willis, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ford & Bodkin for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, and John W. Maltman for Respondent.

FINLAYSON, P. J.—Defendant, who was charged with the murder of Jacob Charles Denton, alleged to have occurred on or about June 2, 1920, in Los Angeles County, was convicted of murder in the first degree and sentenced to life imprisonment. She appeals from the judgment and from an order denying her a new trial.

Defendant did not take the witness-stand in her own behalf. No eye-witness to the tragedy was produced. There was no direct evidence of the killing of Denton. Nor was there any direct evidence connecting the defendant with the homicide. The evidence tending to show that Denton had been murdered and defendant's connection therewith was wholly circumstantial. The record here is very voluminous, covering more than 2,000 pages. The following is a bare outline of a few of the outstanding features of the case, sufficient, however, for an understanding of the points presented for our consideration.

Denton, a man of considerable means, owned a somewhat pretentious residence in the city of Los Angeles, of which he seems to have been the sole occupant immediately preceding its lease to defendant, who, in the latter part of

May, 1920, in response to an advertisement by Denton offering the home for rent, leased the premises of him and thereupon assumed possession. According to witnesses for the prosecution, Denton was last seen alive on June 1, 1920, from which date until August 25, 1920, when she left for Denver, Colorado, after having rented the premises to a third party, defendant occupied the Denton home.

Hearing nothing of her uncle for some time following his disappearance about June 1, 1920, and being anxious about him, Mrs. Paul Aument, Denton's niece, on several occasions during the period that defendant was the occupant of the Denton home made inquiries of the latter, asking her if she had heard from the uncle or knew aught of his whereabouts. Similar inquiries were also made by Mr. Aument, the niece's husband. In response to these inquiries defendant vouchsafed a number of plausible explanations to account for Denton's disappearance, all of a character calculated to quiet the anxieties of Denton's relatives.

On September 23, 1920, a Los Angeles attorney, employed by Denton's daughter, who then was residing in Phoenix, Arizona, began an investigation of Denton's disappearance. This attorney and a private detective whom he had employed to assist him made an examination of Denton's house in Los Angeles—the house that had been leased to defendant in the latter part of May. Upon examining the premises their attention was attracted to the door of a closet or crypt under the staircase in the basement. Two boards had been nailed across the face of the door and the nails driven in as though done by hammering in a clumsy manner. At the foot of the stairway was a pile of dirt. In front of the door stood a phonograph box containing bottles. Upon prying off the door they found in the closet a mound of earth about two feet high. On this mound were several pieces of stove-pipe and pieces of board. Their removal disclosed a white canvas. This they proceeded to pull off. The canvas was stuffed around the mound in such a manner as to cover it completely. Underneath the canvas was a pile of dirt in the shape of a grave, about two feet in height, almost completely covering the floor of the small closet. Obtaining a shovel, the detective dug into the mound and uncovered a foot—

a shoe. At this point it was decided to call in the police. In answer to the call two members of the Los Angeles police force appeared. They shoveled away the dirt, disclosing the body of a man wrapped in a quilt and tied about with rope. The rope was wrapped a number of times around the body and knotted, thus fastening the arms to the side. The body was clad in a shirt, a pair of trousers, and a pair of white shoes. At this point Paul Aument, the husband of Denton's niece, arrived on the scene, and identified a belt buckle connected with the belt around the body as one that had been worn by Denton. It bore the latter's initial, "D." He also identified as Denton's property a ring upon the dead man's hand, as well as a pair of cuff buttons found in the shirt. The remains were in an advanced stage of decomposition and the features were unrecognizable. The body was that of a man weighing about two hundred pounds. It was taken to an undertaking establishment, where an autopsy was held by Dr. Webb, who was then acting as deputy autopsy surgeon in the absence of Dr. Wagner, the autopsy surgeon of Los Angeles County.

Upon the return of Dr. Wagner, he and Dr. Webb held another autopsy at which X-ray photographs were taken. These disclosed some dark bodies in the region of the neck, indicating the presence of metallic substances. A dissection of the neck showed that one of the vertebrae had been broken, and that the broken particles of bone were lodged in the tissue. A small opening at the base of the skull was also found. The tissues were swollen. There was evidence that the vertebral artery had been ruptured and the spinal cord severed. This, according to the evidence given by witnesses for the prosecution—medical experts and others—was due to a bullet which had hit on the side of the vertebra and evidently had passed through. Such a gunshot wound, these medical witnesses testified, would cause instant death. Dr. Wagner testified that the aperture in the neck was about the size made by a 32 or 38 caliber bullet, and stated that in his opinion the cause of death was a gunshot wound through the neck. He further testified that it was impossible to tell how long the corpse had been in the grave where it was found in the basement of the Denton home. He said that there was a constric-

tion around the body, apparently due to a belt, and another around the neck, which might have been caused by a rope. He admitted that there were certain conditions about the body that frequently are found in strangulation, and testified that at the coroner's inquest he had stated that strangulation was a possible cause of the death.

Following its removal to the undertaking establishment, the body and the clothing in which it was found were examined by Denton's relatives and others who had known him in his lifetime. On the body was a shirt on which was a private monogram consisting of the letters "J. C. D." Paul Aument identified the shirt as one that belonged to Denton, stating that the initials "J. C. D." had been made by a rubber stamp that had been in Denton's possession. The belt buckle found on the body and bearing the initial "D," the witness had seen many times on the person of Denton, to whom it had been given by his niece, Mrs. Aument. Paul Aument also identified the trousers worn by the deceased by a pin stripe running through the cloth. He also testified that he had many times seen on Denton's right hand the ring that was found on the body. This ring, he testified, had been enlarged and reconstructed partly with gold from the wedding ring of Denton's wife, and from Denton's mother's ring. The witness also identified the body by a gold tooth. A laundryman, who had taken the laundry from Denton's home, testified that the mark "H. J. H." on the shirt that was found on the body was the laundry mark that had been placed on the shirt for the purpose of identifying Denton's laundry. Other witnesses who had known Denton in his lifetime identified the body as that of their old-time friend.

Upon several occasions prior to the return of the indictment against her and prior to her formal arrest on the charge of murder, defendant made statements to the authorities respecting certain phases of the baffling mystery arising out of Denton's unaccountable disappearance. On one of these occasions, at a ranch in an adjoining county, on October 4, 1920, a deputy district attorney, in the presence of a shorthand reporter and others, propounded a number of questions to defendant respecting certain aspects of the case. These questions were freely answered by her.

The questions and answers were taken down in shorthand by the phonographic reporter, who subsequently transcribed his notes, and his transcription was read to the jury. In her answers to these questions defendant stated facts which, when considered in connection with other evidence in the case, are of a gravely incriminating nature. Defendant objected to the introduction of the statement so made by her on October 4, 1920; and its receipt in evidence is now assigned as error. The statements or declarations made by defendant on these several occasions are replete with contradictions and fanciful excusatory explanations, evidently made in an attempt to establish her own innocence by diverting from herself the accusatory circumstances that pointed to her as the murderer of Denton.

Appellant contends that because she stated in one of these declarations that she had seen Denton alive as late as July 24th, and because this statement as to the date when she last saw Denton was not directly contradicted, the jury was not warranted in finding that Denton died at an earlier date—at a date more in keeping with the prosecution's theory of the case. The jurors were under no obligation to believe any particular part of defendant's unsworn declaration. In so far as its inconsistencies and chimerical statements constituted a self-woven web in whose meshes she had inextricably entangled herself, the jury might consider her declaration as self-incriminatory; but they were under no obligation to accept any part of it as true.

The evidence as to the date of the demise is conflicting. The evidence was, as we have stated, wholly circumstantial, and the date as fixed in the indictment, June 2, 1920, seems to accord more persuasively with the prosecution's theory of the case than would a later date. There are several circumstances in the case, not necessary to be enumerated, that point to June 2d as the date when the man whose body was found in the crypt in the basement of the Denton home met his death. If we find any evidence in the record from which a rational inference might be drawn that the decedent met his death at the time which accords with the prosecution's theory of the case, our inquiry as to that feature of the case can go no further. If the evidence which bears against the defendant, consid-

ered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law and becomes one of fact upon which the decision of the jury is final and conclusive. [1] We sit here in criminal cases solely for the correction of errors of law; and if there is any substantial evidence upon which the verdict may find meritorious support this court cannot, and will not, disturb the jury's determination, even under a claim that there is conflicting evidence which might have raised a reasonable doubt of defendant's guilt. It is the peculiar and exclusive province of the jury to weigh the evidence and pass upon the credibility of the witnesses; and we cannot disturb their verdict on the ground of insufficiency of the evidence unless there is a total deficiency in the evidence or unless it preponderates so clearly against the verdict as to render it clear that the jury must have been under the influence of passion or prejudice. Where it is not clear that the verdict must have been rendered under the influence of passion or prejudice, our examination of the record is only to determine whether legal evidence has been submitted sufficient to warrant a conviction; for the verdict of the jury is their declaration that it is this evidence which has been accepted. (*People* v. *Durrant,* 116 Cal. 200, 201, [48 Pac. 75].)

One of the points made on this appeal is the broad, general contention that the evidence did not warrant the jury in returning a verdict of murder in the first degree. [2] It is the general, if not universal, rule that where, as here, the evidence is entirely circumstantial, and no claim of any mitigating circumstances, justification, or excuse for the killing is advanced by the accused, the jury, from the nature of the wound inflicted, from the character of the weapon which the nature of the wound indicates was used, from the acts and conduct of the accused, and all the attendant and surrounding facts, may infer that the deceased was unlawfully killed by the accused, with malice aforethought, as the result of a deliberate and premeditated purpose to kill, and, so inferring, the jury, under such circumstances, may be warranted in returning a verdict of murder in the first degree. If a different rule prevailed, then, as was said in *People* v. *Mahatch,* 148 Cal. 203, [82 Pac. 779], "secret murders could rarely be punished by

the infliction of the highest penalty." As is well said
by an eminent author, "Crimes, and especially those of the
worst kinds, are naturally committed at chosen times, and
in darkness and secrecy; and human tribunals must act
upon such indications as the circumstances of the case
present or admit, or society must be broken up. Nor is it
very often that adequate evidence is not afforded by the
attendant and surrounding facts to remove all mystery,
and to afford such a reasonable degree of certainty as
men are daily accustomed to regard as sufficient in the
most important concerns of life; to expect more would be
equally needless and absurd." (See *State* v. *Dickson*, 78
Mo. 447.)   [3]   The question of the degree of the crime
is exclusively for the jury, and their determination will
not be disturbed when there is any evidence to support
it. (*People* v. *Machuca*, 158 Cal. 64, [109 Pac. 886].)   [4]
We think that the circumstances disclosed by the evidence
are ample to support the inference that the killing was
unlawful, was done with malice aforethought, and was
willful, deliberate, and premeditated.

Appellant urges two specific objections against the suffi-
ciency of the evidence to justify the verdict. These are:
(1) That the evidence is insufficient to establish that the
death of the person whose body was found in the basement
of the Denton home was caused by a gunshot wound;
and (2) that the evidence is insufficient to show that the
body was that of Jacob Charles Denton.

[5]   In support of the first of these two points re-
specting the sufficiency of the evidence it is claimed that
the evidence supports the theory that death was caused
by strangulation, and not the theory that a bullet from a
pistol was the cause of death. From these premises it is
argued that the evidence demonstrates that a woman of
defendant's apparent weight and strength could not
strangle to death a man weighing two hundred pounds,
and, unaided and before *rigor mortis* had set in, drag
the body from one of the floors of the Denton home to the
basement, where it was found. Physicians called on behalf
of defendant testified that, from conditions of the body
as described by the prosecution's witnesses, it was their
opinion that strangulation was the probable cause of death.
Countervailing this testimony is the evidence given by the

people's witness, Dr. Wagner, who gave it as his opinion, based on his personal observations of the body and X-ray photographs of the wound in the neck, that death was caused by a gunshot wound through the neck, from which death ensued practically instantaneously. A substantially similar opinion was given by Dr. Webb. It is true that when Dr. Webb held his first post-mortem examination he found conditions in the body which he then stated indicated that strangulation might have been the possible cause of death. This was before the second autopsy, that of October 20th, revealed a wound in the neck and the presence therein of metallic substances tending to show that a bullet had passed through the vertebral artery and severed the spinal cord. It is also true that Dr. Wagner, on his cross-examination, testified that he could not tell, from his inspection of the body, how long the deceased had been dead, nor whether the shot was fired before or after death. At most, these facts merely indicate that, following the discovery of what appeared to be a bullet wound, Dr. Webb abandoned any theory of strangulation, as the probable cause of death, in favor of what to him was the more reasonable theory of death by gunshot wound. And though Dr. Wagner admitted that he could not tell whether the shot was fired before or after death, he still was of the opinion, based on his own observations of the body and the X-ray photographs, that a gunshot wound was the cause of death. The jurors, who had all the facts and circumstances before them, were in a position to judge between the opposing theories advanced by the medical witnesses and to determine which was the more probable in view of all the conditions as explained to them by the witnesses in the case. So all we have is a conflict in the theories offered by the medical experts. Such being the case, we cannot sustain appellant's contention that the evidence was wholly insufficient in law to sustain the verdict.

[6] Moreover, even if strangulation were the cause of death, it would not necessarily follow that the evidence was not sufficient to justify the verdict of murder in the first degree. The indictment, following the form long approved in this state, does not state the manner or means of death. The prosecution, therefore, could advance any

reasonable hypothesis as to the cause of death, and the jurors were free to adopt such theory as, in their judgment, was most in accord with a reasonable interpretation of all the incriminatory circumstances in the case. That the person whose body was found in the basement of the Denton home was Denton himself was, as we shall presently show, sufficiently established by the circumstantial evidence brought before the jury for their consideration. That the deceased was murdered by someone under circumstances warranting an inference of malice, premeditation, and deliberation is, as we have said, an inference that is reasonably deducible from all the circumstances of the case. If strangulation was the means used to kill the deceased, it undoubtedly took some appreciable time to complete the atrocious deed after the victim had become helpless. If strangulation was the cause of death, the pressure, without doubt, was steady and continuous, and was applied with wicked and cool depravity. This fact, coupled with the inherent cruelty and barbarity of such means of causing another's death, would justify the jury in finding that the murderer, whoever he or she might be, had killed the deceased unlawfully and deliberately, with malice aforethought and premeditation. (Wharton on Homicide, pp. 225–227.) But it is claimed that, irrespective of any question as to the degree of the crime, if Denton, a large and powerful man, weighing about two hundred pounds, was strangled to death, a woman of defendant's build and strength could not have been the perpetrator of the deed. This hypothesis is not so demonstrable as to preclude the jury from reaching a different conclusion. The fact that Denton was foully murdered by someone, with a willful, deliberate, and premeditated purpose to kill, was sufficiently established. The fact of defendant's guilty connection with that murder, no matter how it was accomplished, might well be inferred from all the circumstances of the case, particularly from the many inconsistencies and obvious fabrications found in the specious and fanciful extrajudicial explanations vouchsafed by her to explain certain peculiar phases of the case. That theft was her motive might well be inferred from many facts to which, so far, we have not deemed it necessary to allude. For example, there is the fact that, subsequent to Denton's disap-

pearance, defendant took possession of his jewelry, some of which was disposed of by her. **[7]** It has been held that possession by the accused, shortly after the homicidal death, of articles known to have belonged to the decedent, under circumstances that would justify the inference of larceny, is sufficient to establish the guilty agency of the accused, especially when coupled with his false statements as to the whereabouts of the missing person. (*State* v. *Barnes,* 47 Or. 592, [7 L. R. A. (N. S.) 181, 85 Pac. 998].) As was said in *Williams* v. *Commonwealth,* 29 Pa. St. 102, ''If criminal offenses are to be punished, circumstances like these must be laid hold of to prove them.'' Moreover, there was an abundance of circumstantial evidence sufficient to have warranted the jury in inferring that defendant, either alone or with the aid of some unidentified confederate or confederates, had concealed the body where it was found in the crypt under the cellar staircase. **[8]** It is one of the badges of guilt to attempt concealment of the act done; and where a homicide has been committed and the body is concealed, it is a legitimate inference therefrom that the person who concealed the body is connected with the crime as author or participator. (*State* v. *Dickson,* 78 Mo. 447.) For these reasons it was not necessary that the jury should have adopted any particular theory as to how the deed was accomplished. To warrant the verdict it was not necessary that the prosecution should have proved, or that the jury should have believed, that a gunshot wound, and not strangulation, was the cause of death.

Just as little merit is there in the claim that the dead body was not identified as that of Denton. It is true that; when the corpse was found, the features were unrecognizable. But relatives and former acquaintances of Denton were able to, and did, identify the remains as those of Denton by the clothing found thereon; by a belt buckle, a ring and cuff buttons, a gold-crowned tooth, by an old fracture of the upper third of the right arm, as well as by a general resemblance in the outlines of the face, disfigured though it was by putrefaction, and in the contour and weight of the body. **[9]** This was sufficient to meet the most exacting requirements of the law, which does

not demand direct or positive proof as to the identity of the body of a murdered man. Identity may be shown as effectively by inferences from facts and circumstances as from the positive testimony of witnesses. Where the body has been badly burned, mutilated, or decomposed, identity may be established, as it was here, by articles of clothing and other personal belongings found on or near the body, especially where, as in the instant case, the accused has made false statements in an attempt to account for the disappearance of the person in question. (*People v. Palmer*, 109 N. Y. 110, [4 Am. St. Rep. 423, 16 N. E. 529]; *People v. Beckwith*, 108 N. Y. 67, [15 N. E. 53]; *Commonwealth v. Webster*, 5 Cush. (Mass.) 295, [52 Am. Dec. 711]; *State v. Pepo*, 23 Mont. 473, [59 Pac. 721]; *Hawkins v. State*, 60 Neb. 380, [83 N. W. 198]; *State v. Dickson, supra; State v. Barnes, supra,* and notes on p. 181 et seq., 7 L. R. A. (N. S.); 21 Cyc. 887; Wharton on Homicide, p. 910.) In *People v. Palmer, supra,* such evidence was held to be sufficient notwithstanding the testimony of witnesses that they had seen the person alleged to have been murdered after the date of the alleged murder, the court saying that such witnesses were "probably honest, but quite mistaken." So, also, in the Webster case (5 Cush. (Mass.) 295), there were five persons who honestly believed that they saw the deceased alive after he, in fact, had been killed. [10] Where the body is identified by the clothing and articles found thereon, it rests exclusively with the jury to determine, from all the evidence, what weight to give to such identifying circumstances; and if there is a conflict in the evidence, their determination is conclusive upon this court.

[11] On September 24, 1920, on the top shelf of a closet in a room on the second floor of the Denton home, one of the detectives working on the case found a 32-caliber revolver in its holster. It will be recalled that, though Dr. Wagner was unable to state accurately the caliber of the bullet that caused the aperture in the neck of the deceased—probably on account of the decomposed condition of the body—he did testify that the wound was about the size made by a 32 or 38 caliber bullet. In the revolver found in the closet were five loaded cartridges and one empty shell. The closet in which the pistol was found

was locked, being entered by the detective with a pass-key. Several dresses, hanging on hangers, were in the closet at the time. The pistol was identified by two witnesses, who said that it was Denton's revolver. The room in which it was found had been occupied by Denton prior to the lease of the premises to defendant. Following this lease, and until about the time when she left for Denver on the 25th of August, after having leased the premises to a third party, defendant occupied this room. On several occasions, in her statements to others, defendant claimed that on the night of June 2d or the morning of June 3d Denton had had a quarrel with a Spanish woman, who, the evidence tends to show, was a mythical personage invented by defendant to account for Denton's disappearance. In these statements defendant, it is evident, tried to create the impression that, in his quarrel with this supposititious individual, Denton had slightly wounded the "Spanish woman." On October 15th, in a conversation that defendant had with an investigator for the district attorney's office, she was asked with what weapon Denton had shot the "Spanish woman." Her reply was: "Well, you have got the gun, the gun that was taken out of the locker upstairs—or, rather, the closet." She then went on to state that the bullet that had wounded the Spanish woman—a bullet from this pistol, according to her statement—subsequently was found by her in the bathtub upstairs. These replies have a tendency to show that defendant had knowledge of the presence of the revolver in the closet and that one of the cartridges had been discharged.

The revolver, its holster, and the cartridges were admitted in evidence, over defendant's objection. This was not error. It was necessary for the prosecution to show, as accurately as the circumstances would permit, the means by which and the manner in which Jacob Charles Denton had come to his death "The relevancy of proffered proof in a criminal case depends upon whether or not it tends to sustain a legitimate hypothesis of the guilt of the defendant, and, generally speaking, an incidental fact is relative to the main fact in issue when, in accord with the ordinary course of events and common experience, the existence of the incidental fact, standing alone or when considered in connection with other established facts, tends

in some degree to make the main fact in issue certain. It is not necessary that such incidental fact should bear directly upon the main fact in issue, for it will suffice as a pertinent piece of proof if it can be said to constitute a link, however small, in the chain of evidence and tends thereby to establish the existence of the main fact in issue. [Citing authority.] Hence any fact is relevant evidence which naturally tends to show the means and method employed in the commission of a crime; and, therefore, it was proper in the present case to admit evidence of the identification of the cartridge picked up near the scene of, and shortly after the explosion, and, having been so identified, they were rightfully admitted in evidence." (*People* v. *Billings,* 34 Cal. App. 552, 553, [168 Pac. 396, 398].) Dr. Wagner, who gave it as his opinion that a gunshot wound was the cause of death, described to the jury the character and size of the aperture in the neck, saying that "it was *about* the size that is generally made by a 32 or 38 caliber bullet." The body was not before the jury. So the doctor, in the testimony just quoted, is describing the condition of the body at the time when he held the autopsy; he is describing, as accurately as his recollection will permit, the nature of the wound and the size and character of the aperture in the neck, and he says that the aperture was "about" the size that is generally made by a 32 or 38 caliber bullet. From all the facts as detailed to them by the physicians and by the lay witnesses respecting the nature of the wound that was found in the neck of the body, the jurors might well have drawn the inference that a bullet through the neck from a 32-caliber revolver was the cause of death. The nature of the wound in the neck, the particles of metal found therein, the presence of the 32-caliber revolver in the locked closet of the room that was occupied by the defendant at the time when it is probable that the murder was perpetrated, the fact that one cartridge in the revolver had been discharged, considered together and with the other circumstances in the case, had a direct tendency to show that the wound found in the neck of the body had been made by a bullet from this revolver that was found in the closet, thus tending to connect defendant with the perpetration of the homicide. In *People* v. *Sampo,*

17 Cal. App. 149, [118 Pac. 963], referring to the admission in evidence of a rock found at the place where the defendant had beaten the deceased, the court held that such evidence was properly admitted, not only because there was testimony that the defendant had used a rock in attacking the deceased, but also because this rock was admissible in evidence for the following reasons: "Moreover, the doctors testified that the wound inflicted upon Pistone's head appeared to have been produced by some blunt instrument, and that it could have been caused by the use of the rock in question. Having been found at the very place where the beating occurred, with fresh blood stains thereon, and in view of the testimony of the physicians that the wound could have been made by means thereof, the rock itself constituted a pertinent circumstance, to be considered with the other evidence, in determining the question of the guilt of the accused." See, also, *People* v. *McDowell,* 64 Cal. 467, [3 Pac. 124], where it was said that testimony that a slungshot was found in the possession of the defendant was admissible because it was evidence tending to show "that the wounds inflicted upon the person of the deceased *might* have been caused by such an instrument." To the same effect are *People* v. *Nakis,* 184 Cal. 105, [193 Pac. 92]; *People* v. *Wilson,* 23 Cal. App. 519, [138 Pac. 971]; *People* v. *Gilman,* 43 Cal. App. 453, [185 Pac. 310], and *People* v. *Carson,* 49 Cal. App. 12, [192 Pac. 318].

The inability of Dr. Wagner to say definitely whether the aperture in the neck was of the size made by a 32 or by a 38 caliber bullet, or whether the bullet was fired before or after death, is not a ground for the exclusion of the revolver. It was the province of the jury to determine from a due consideration of all the circumstances in the case (including the fact that a 32-caliber revolver with one cartridge discharged was found in Mrs. Peete's closet) whether the deceased came to his death from a revolver of that caliber fired by the defendant. Answering a somewhat similar objection urged by the defendant in *People* v. *Sullivan,* 129 Cal. 560, [62 Pac. 103], the court said: "Notwithstanding the slight difference in weight in the bullet, under the circumstances it cannot be said that the jury were not justified in finding that it was the one

shot from the gun borrowed by defendant, nor can it be
said that the chain of circumstantial evidence was not suffi-
cient to support the verdict of the jury. 'It is the peculiar
province of the jury to weigh the evidence and decide upon
the credibility of the witnesses; and it is not our practice
to disturb verdicts on this ground unless there is either
a total deficiency in the evidence or it preponderates so
greatly against the verdict as to render it clear that the
jury must have been under the influence of passion or
prejudice.' '' [12] Any objection that the time of the
discovery of the pistol was too remote from the date of
the crime, or that defendant was not in the actual occu-
pancy of the premises at the time of the discovery, or that
there was a possibility that unknown persons may have
visited the house in the meantime, goes to the probative
force of the evidence, but does not affect its admissibility.
(See *People* v. *Nakis, supra,* and *People* v. *Carson, supra.*)
The case of *People* v. *Hill,* 123 Cal. 571, [56 Pac. 443],
relied upon by appellant's counsel, is altogether different
from this. In that case a large club was admitted in evi-
dence, and the supreme court in its opinion said: ''There
was no evidence identifying the stick as the one with
which the defendant struck the deceased or in any way
connecting the defendant with it.'' In the instant case it
was shown that the wound in the neck might be produced
by a bullet from just such a revolver as that which, with
one cartridge discharged, was found secreted in the closet
of a room that defendant had occupied at the time when
the murder presumably was committed. And defendant's
statement to the investigator for the district attorney's office
tends to show that she knew all about the pistol, where it
had been secreted, and that one shot had been fired from
it. The court properly overruled the objection to the
introduction of this evidence.

[13] It was not error to permit to be read to the jury
the phonographic reporter's transcription of the statements
that defendant had made at the Glenn ranch on October 4,
1920, in the presence of the deputy district attorney and
others. The reporter testified that he took accurate short-
hand notes of all that was said, and that his transcription
thereof was correct. The document shows that defendant,
upon this occasion, made declarations respecting her move-

ments from the time she first met Denton in the latter part of May, 1920, up to the time when the statement was made on October 4, 1920. The statement covers 102 pages of the record on this appeal. It is obvious, therefore, that no one could accurately remember all that was said by the defendant and her interrogator without having his recollection refreshed either by the shorthand notes of the questions and answers or by the transcription thereof. If, therefore, the statement made by the defendant upon this occasion is not so far within the scope of a "confession" as to be inadmissible until a proper foundation is laid by showing its voluntary character, it was not error to permit the witness to read the transcription of the shorthand notes. See *People* v. *Ammerman,* 118 Cal. 32, [50 Pac. 18], where the court says: "That the witness, Hall, was permitted to read his transcription of the statement, taken down by him in shorthand, was not error. He had a right to refer to this to refresh his memory." See, also, *Estate of Moore,* 180 Cal. 585, [182 Pac. 291], where it is said that, though there is some difference in the practice in the several jurisdictions of the country, the tendency of the courts "is toward liberality rather than strict technicality in the application of the rules with respect to the admission of this sort of evidence."

[14] Many of defendant's declarations, as set forth in the statement, are her explanations of suspicious circumstances which, if not explained satisfactorily, would naturally tend to point more or less conclusively to herself as the guilty agent, or one of the guilty agents, in the commission of the crime. Her declarations, when compared one with another, and particularly when considered in connection with the facts established by the sworn witnesses in the case, appear to have been disingenuous fabrications concocted to serve the purpose of a red herring drawn across defendant's trail to throw the authorities off the scent. At any rate, they are of such a character that the jury would be justified in drawing the inference that such was their purpose. We would not have it understood that the interpretations which we have put upon the several statements made by defendant from time to time are the only legitimate constructions of which they are susceptible. It is possible that they could be viewed in a

more charitable light and characterized less harshly. But, when analyzed and compared with all the facts in the case, they are reasonably subject to the inference that they are but false fabrications made with the preconceived design to thwart the efforts of the officers to solve the mystery of Denton's disappearance. And since, to support the verdict, it is our duty to assume that the jury indulged every reasonable hypothesis and inference which may be deduced from the evidence, we are justified in characterizing defendant's several declarations and admissions in the manner that we have—that is, as false statements made for the purpose of misleading those who were endeavoring to solve the many puzzling problems attending the disappearance of Jacob Charles Denton. This being so, defendant's statements are brought within the rule that false declarations made for the purpose of misleading or warding off suspicion, though not conclusive of guilt, may nevertheless strengthen the inference arising from other facts. Such false and fabricated statements are admissible on the same theory that evidence of flight and concealment is admissible to show a consciousness of guilt. (*People* v. *Cole,* 141 Cal. 90, [74 Pac. 547].)

[15] The prosecution made no attempt to lay any foundation for a ''confession'' before offering defendant's statement in evidence, it being the theory of the district attorney that the statement was not a ''confession'' but an ''admission,'' and as such receivable without any prior evidence of its voluntary character. We think this theory is fully justified by the nature of the statement. In no part of defendant's recital of what she claimed to be her own conduct after she met Denton, or of what she claimed to be the facts surrounding the mystery of his disappearance, did she state or admit that she had done any wrongful or unlawful act in connection with the murder for which she subsequently was indicted. None of the facts admitted by her imported guilt or involved a crime—at least not any such crime as homicide. Her statement, which is a mass of evasions, equivocations, and attempted explanations to account for Denton's disappearance and to establish her own innocence, was intended to negative the idea that she participated in any manner in the disappearance or the killing of Denton. True, it contains admissions

54 Cal. App.—23

of facts, which, when taken in connection with other proved facts in the case, are circumstances of a highly incriminating nature; but it is by no means a confession of guilt. There is a clear distinction between a "confession" and an "admission" or "declaration." And though an admission by a person charged with crime, stating or suggesting the inference that he committed the crime, is so far within the scope and purpose of a "confession" that it is not admissible until a foundation has been laid by showing that it was made voluntarily (*State* v. *Novak,* 109 Iowa, 717, [79 N. W. 465]; *State* v. *Nagle,* 25 R. I. 105, [105 Am. St. Rep. 864, 54 Atl. 1063]), still, to constitute an admission or declaration a "confession," it must in some way be an acknowledgment of guilt and be so intended. (*State* v. *Novak, supra.*) A mere admission or declaration by a defendant against his interest is not necessarily a confession; and this is true even though the admission is criminative. (*State* v. *Novak, supra.*) The Oregon supreme court has stated the distinction as follows: " . . . the admission of a fact, or of a bundle of facts from which guilt is directly deducible, or which within and of themselves import guilt, may be denominated a confession, but not so with the admission of a particular act or acts or circumstances which may or may not involve guilt, and which is dependent for such result upon other facts or circumstances to be established." (*State* v. *Porter,* 32 Or. 135, [49 Pac. 964].) The distinction between a confession of guilt and a mere admission of a fact or facts not constituting guilt of the offense in question is clearly pointed out in *People* v. *Clifton,* 186 Cal. 143, [198 Pac. 1065], and is fully and learnedly considered in *People* v. *Fowler,* 178 Cal. 657, 664, [174 Pac. 892], and need not be further discussed here. Suffice it to say that, tested by the distinctions set forth in the above-cited authorities, defendant's statement of October 4, 1920, was an "admission" and not a "confession," and, therefore, was admissible without preliminary proof that it was made voluntarily. For it is the established rule that the admission of a fact, not in itself involving criminal intent, is not to be rejected as evidence without preliminary proof that it was made voluntarily merely because, when connected with other facts, it may tend to establish guilt. (*People* v. *Ammerman,* 118 Cal.

32, [50 Pac. 18] ; *People* v. *Knowlton,* 122 Cal. 357, [55 Pac. 141] ; *People* v. *Jan John,* 144 Cal. 286, [77 Pac. 950] ; *People* v. *Weber,* 149 Cal. 339, [86 Pac. 671] ; *People* v. *Wilkins,* 158 Cal. 534, [111 Pac. 612].)

[16] It is of no consequence that the precise date of the death was not shown before the statement was received in evidence, and that, therefore, some of the facts as detailed by defendant may have occurred before the homicide. She was interrogated about matters relating to Denton's disappearance and his supposed murder. The facts set forth in her answers all revolve around the tragedy as the central theme. They are the separate links in one chain. The unlawful killing of Denton by someone with malice aforethought was established by circumstantial evidence sufficient for that purpose. And it matters not that some of the facts detailed in defendant's statement may have occurred before the homicide. Not only are all the facts narrated by her parts of the one statement, but they are all so interrelated that the statement is an entire and connected one, bearing upon the same subject matter and, therefore, admissible. (*People* v. *Cahill,* 193 N. Y. 232, [20 L. R. A. (N. S.) 1084, 86 N. E. 39].) Taken together, defendant's declarations, as set forth in this statement, when considered in the light of the other proved facts in the case, have a tendency to connect her with the crime as the guilty agent, or as one of the guilty agents, if, indeed, she was aided and abetted by a confederate or confederates.

[17] There is no merit in the objection that the statement did not consist alone of declarations made by defendant, but was in part made up of accusatory questions propounded to her by the deputy district attorney. Not only do the questions and answers constitute one entire and connected statement relating to the same subject matter, and for that reason, if for none other, receivable in evidence, but the questions were admissible for the further reason that they come within the universally recognized rule that any incriminatory statements made to an accused person, and his replies thereto, may be admitted in evidence, unless his replies are denials free from equivocation and deceit. The accusatory statements are not direct evidence, but are admissible in connection with the replies for the

purpose of showing the accused's reaction to the questions, or that his answers were not those of an innocent man, or were, such as to implicate him in the commission of the crime with which he is charged. (*People* v. *Bradley,* 23 Cal. App. 44, [136 Pac. 955]; *Commonwealth* v. *Spiropoulos,* 208 Mass. 71, [94 N. E. 451]; 16 C. J. 634. See, also, *People* v. *Ammerman, supra.*)

What we have said respecting the admissibility of the long statement made by defendant at the Glenn ranch on October 4, 1920, is equally applicable to the admissibility of the conversation between defendant and Mr. Doran, the chief deputy district attorney, held at the latter's office on October 12, 1920. Moreover, there does not seem to have been any objection or motion to strike out the material and really damaging parts of this conversation. In the early part of Mr. Doran's testimony, defendant's counsel did, it is true, move to strike out that part of the conversation which was then being narrated by the witness, upon the ground that it is "incompetent" and does not "throw any light on the transaction which the jury is trying to determine." At the time this motion to strike was made, Mr. Doran was relating that part of the conversation in which he expressed to defendant his sympathy over her predicament, and in which he said that it was unfortunate that everyone seemed to be against her. There does not appear to have been any ruling upon the motion to strike out this part of the witness' testimony. But even if a failure to grant this motion to strike out the particular part of the conversation to which the motion was directed were error, it was harmless error, since the part complained of was not of a damaging character. Beyond this motion to strike, the failure to rule upon which was at most but harmless error, we have, as already stated, been unable to find any objection to or motion to strike out Mr. Doran's testimony respecting his conversation with defendant on October 12, 1920.

[18] Appellant complains that there is no evidence in the case authorizing the charge of the court upon the law applicable to an accomplice; that it was calculated to confuse and mislead the jury, and was therefore harmful and prejudicial. The instruction complained of is as follows: "All persons concerned in the commission of a

crime, whether it be felony or misdemeanor, and whether
they directly commit the act constituting the offense, or
aid and abet in its commission, or, not being present, have
advised and encouraged its commission, are principals in
any crime so committed. . . . For one person to abet an-
other person in the commission of a criminal offense simply
means to knowingly and with criminal intent aid, promote,
encourage, or instigate, by act or counsel, or by both act
and counsel, the commission of such criminal offense.''
Conceding the correctness of the instruction as an abstract
proposition of law, appellant insists that it is not applicable
to the facts of the case or to any legitimate theory rea-
sonably deducible from the established facts. It is claimed
that the effect of the instruction was to advise the jury
that even though they believe that Denton met his death
by strangulation, and that defendant, unaided, was not
able to strangle a man of Denton's physique, still they
could convict upon the theory that defendant had aided and
abetted some person or persons who may have been the
actual stranglers. The core of the objection lies in the
assumption that there was no evidence to justify the in-
ference that defendant aided or abetted any person or
persons in the killing of Denton. We can see no force
in the objection. There was no direct evidence as to the
manner or circumstances of the killing. The evidence of
the murder and of defendant's guilty agency rested entirely
on circumstantial evidence. As we already have taken
occasion to say, the prosecution was not bound to offer or
support any particular theory as to the manner of the
crime, but might properly contend that it was committed
in any manner which the evidence showed reasonably pos-
sible. (*People* v. *Weber,* 149 Cal. 339, [86 Pac. 671].)
We already have shown that there was sufficient evidence
to warrant the inference that the deceased was killed un-
lawfully, with malice aforethought, by a gunshot wound
inflicted by the bullet from a pistol fired willfully and with
a deliberate and premeditated purpose to kill. But the
inference that the murder was so accomplished was not the
only legitimate inference. Physicians who gave evidence
on behalf of the defense, basing their opinion upon the
facts disclosed by the first autopsy conducted by Dr. Webb,
testified that, in their opinion, death was caused, probably,

though not necessarily, by strangulation. Here, therefore, were the bases for at least two legitimate theories as to the probable cause of death—the theory that death was caused by a gunshot wound and the theory that strangulation was the cause. That the body was Denton's was shown by circumstantial evidence of a convincing character. That Denton's death was not accidental nor self-inflicted with suicidal intent, but that he was killed unlawfully, with malice aforethought, willfully, and with a deliberate and premeditated purpose to kill, is amply disclosed by all the attendant circumstances—circumstances showing that whoever committed the deed did it with an abandoned and malignant heart. That this defendant was concerned in the commission of the crime as a guilty agent is also a legitimate inference supported by an accumulation of incriminating circumstances. Among the circumstances pointing to defendant as a guilty agent in the commission of the crime are the following: Her unlawful possession of some of Denton's personal property subsequent to his disappearance; her false claim that Denton had given her a bill of sale to his automobile; and the cashing by her of checks drawn in the name of Denton as the apparent drawer, but which, unless the jury chose to accept her specious explanation of the circumstances under which they were signed, were palpable forgeries. This, and much other similar evidence, pointed to theft as the probable motive. In addition to this evidence of motive, we have defendant's indubitable fabrications, made with the apparent purpose of explaining suspicious circumstances that pointed to her as the guilty person. There are also her many contradictory statements; her intimate knowledge of facts that only a person connected with the commission of the crime would be likely to know; her causing earth to be taken from the garden a short time after Denton's disappearance and placed in the cellar near where Denton's body was subsequently found under a shallow mound of earth. All these and many other facts too numerous to relate point circumstantially to defendant as a guilty agent in the commission of the crime. Whether she was the sole perpetrator of the deed or whether she had accomplices whom she aided and abetted was not disclosed by the evidence. But that she was a guilty agent, and therefore either the sole

perpetrator of the crime or an aider and abettor of accomplices, was an inference legitimately deducible from all the incriminating circumstances, a few of which we have taken occasion to enumerate. This being so, it was proper to charge the jury, in the language of the code (Pen. Code, sec. 31), that "all persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, are principals in any crime so committed." By the provisions of section 1127 of the Penal Code it is made the duty of the court to charge the jury as to all matters of law necessary for their information. And since there was no direct evidence as to the manner or the circumstances of the killing, and since the evidence supports two theories as to the manner of the killing, either of which, if found correct, would justify a finding that Denton had been murdered, and since the evidence is sufficient to connect the defendant as a guilty agent in the commission of the crime irrespective of which of the two possible theories as to the manner of the killing be correct, it was proper to give an instruction based upon the theory that she aided and abetted in the commission of the murder. If strangulation was the manner whereby Denton was put to death, and if, as her counsel claim, defendant alone could not have strangled a man of Denton's size and weight, and if, nevertheless, she was, as the evidence tended to show, in some manner concerned with the commission of the crime as a guilty agent, it is a legitimate inference that she had accomplices whom she aided and abetted, though there be no direct evidence of that fact; and therefore it was proper to give the instruction. (See *People* v. *Wong Hing,* 176 Cal. 699, 705, [169 Pac. 357]; *People* v. *Billings,* 34 Cal. App. 556, 557, [168 Pac. 396].) **[19]** To justify an instruction on an issue raised by the evidence, positive testimony is not required. It is sufficient if the fact may reasonably be inferred from circumstances proved. (See *Turner* v. *State,* 138 Ga. 808, [76 S. E. 349]; *Thompson* v. *State,* 147 Ga. 745, [95 S. E. 292].)

**[20]** The defense requested, and the court refused, an instruction as follows: "If you find the defendant guilty

of murder, it will be your duty to determine the degree. The refusal to give this instruction is now assigned as error. By a general instruction on the subject of homicide, the court correctly defined and distinguished the two degrees of murder and manslaughter. This it did so clearly and completely that the jury must have understood what state of facts would constitute each of those offenses. In so charging the jury the court told them that there are two classes which the legislature has taken upon itself the responsibility of saying shall be murder in the first degree —namely, where the killing is perpetrated by means of poison, etc., or is done in the perpetration or attempt to perpetrate some one of the felonies mentioned in the code; and after so instructing the jury, the court then told them that there is another and much larger class of cases included in the definition of murder in the first degree— viz., those cases where there is a willful, deliberate, and premeditated intent to kill, and that as to this class the legislature leaves it to the jury to determine the degree of crime. This part of the instruction was couched in the following language: ''In this class [that is, where, not being perpetrated by means of poison, etc., or in the perpetration or attempt to perpetrate any of the felonies mentioned in the code, the killing is, nevertheless, willful, deliberate, and premeditated] the legislature leaves the jury to determine, from all the evidence before them, the degree of the crime, but prescribes for the government of their deliberations the same test which has been used by itself in determining the degree of the other two classes, to wit: the deliberate and preconceived intent to kill.''

It is provided by section 1157 of the Penal Code that ''whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty.'' Because of this code provision, it is claimed that the court, in compliance with defendant's special request, should have specifically instructed the jury that it is their ''duty'' to determine the degree if they find the defendant guilty of murder. Without doubt, the requested instruction was unobjectionable, and, perhaps, should not have been refused. But even so, we cannot see how defendant was injured by the refusal. As we have said, the court, in its general instruc-

tion upon the subject of homicide, clearly defined and distinguished the two degrees of murder, and told the jurors that it is left to them to determine, from all the evidence before them, the degree of the crime, save in those special cases which the legislature has taken upon itself the responsibility of saying shall conclusively be deemed to be murder in the first degree. This being so, it was not necessary to specifically charge the jurors that, if they found the defendant guilty of murder, it would be their "duty" to determine the degree. It must be assumed that the jurors are fair and intelligent men and women and that they require no special admonition or instruction as to obvious matters and rudimentary principles of just and intelligent conduct on their part. If, from the care and completeness with which the court, for the guidance of the jurors, defined and distinguished the degrees of murder, the jury did not understand that it was their "duty" to determine the degree of murder of which the defendant was guilty, in the event that they found her guilty of murder at all, then, as was said in *People* v. *Scott,* 24 Cal. App. 449, [141 Pac. 949], "they were certainly lacking in an essential qualification for jury duty, that is, the possession 'of ordinary intelligence.' " [21] The case falls within the well-established rule that it is not error to refuse to give a special instruction, in itself unobjectionable, if it already has been covered properly and sufficiently by other instructions comprehensive enough to embrace the whole law applicable to that branch of the case.

[22] It is claimed that there was no proof of venue. It is argued that because the venue depends, not upon where the dead body may be found, but upon the place where the mortal wound was inflicted, it may not be inferred that the deceased was killed in Los Angeles County. The objection lacks merit. [23] The venue, like any other fact in a criminal case, may be established by circumstantial evidence. And though no witness testified that Denton was murdered in Los Angeles County, the conviction being based entirely on circumstantial evidence, it is uncontradicted that the body was found in the city of Los Angeles, in the basement of the house that Denton had leased to defendant, many miles from the county line, covered with a mound of dirt, canvas, and other articles,

showing that the body had been placed there by someone. This evidence, unexplained, was sufficient to justify the jury in concluding that the homicide was committed in Los Angeles County. In *Hawkins* v. *State,* 60 Neb. 380, [83 N. W. 198], it was held that "evidence of the finding of the headless body of the person alleged to have been murdered in an old well which had been subsequently filled, situate in Frontier County, is sufficient, in the absence of other proof, to warrant the jury in concluding that the homicide was committed in that county." To the same effect is *People* v. *Kamaunu,* 110 Cal. 609, [42 Pac. 1090]. See, also, Wharton on Homicide, pp. 901, 902.

[24] It appearing to the trial court, after twelve jurors had been impaneled and sworn, that the trial was likely to be a protracted one, and that, therefore, the case is one calling for an "alternate jury," as provided by section 1089 of the Penal Code, the clerk was ordered to draw from the term trial jury-box the name of an additional juror. Accordingly, the name of one O'Dell was drawn. After being sworn on his *voir dire* to make true answers to questions respecting his qualifications, O'Dell was examined, passed for cause, accepted as the "alternate juror," and as such was duly sworn well and truly to try the matter in issue and a true verdict render according to the evidence. We are justified in assuming that this was, in substance, at least, the oath that was administered to O'Dell; for it is the form of oath prescribed by statute for the regular jurors (Code Civ. Proc., sec. 604), and section 1089 of the Penal Code provides that alternate jurors shall take the same oath as the jurors already selected. Having thus taken the same oath that had been taken by the twelve regular jurors, O'Dell, as such "alternate juror," attended at all times upon the trial of the cause in company with the other jurors, and was seated near, with equal power and facilities for seeing and hearing all the proceedings. Before the submission of the case, and about two weeks after O'Dell had thus been called and sworn as an "alternate juror," and after much evidence had been introduced, one of the regular jurors originally impaneled and sworn to try the matter in issue, Juror Rudd, became so ill that he was unable to continue the performance of his duties as a juror. Whereupon the court

ordered that he be excused from further service, and that
O'Dell, the "alternate juror," take Rudd's place in the
jury-box. Everything that was done in this connection
is shown by the minutes, and seems to have been in strict
accord with the provisions of section 1089. It is now
claimed that that section is unconstitutional in that it
deprives a defendant of his right to a trial by jury as
known to the common law. We do not think the con-
tention is tenable.

Section 1089, added to the Penal Code by the act of
March 28, 1895 (Stats. 1895, p. 279), provides that when-
ever, in the opinion of the judge of the trial court, the
trial is likely to be a protracted one, the court, immediately
after the jury is impaneled and sworn, may direct the
calling of one or two additional jurors, to be known as
"alternate jurors," who shall have the same qualifications
as the regular jurors, be subject to the same examination
and challenges, and who, after having taken the same oath
as the other jurors, shall be seated near, with equal power
and facilities for seeing and hearing the proceedings in
the case, and shall attend at all times upon the trial in
company with the other jurors. It is further provided by
the section that if, before the final submission of the case,
a juror shall die, or shall become so ill as to be unable
to perform his duties, the court may order his discharge
and draw the name of an "alternate," who shall then take
his place in the jury-box and be subject to the same regu-
lations as though he had been selected as one of the original
jurors.

Section 7 of article I of the Bill of Rights, contained in
the constitution of this state, provides: "The right of trial
by jury shall be secured to all, and remain inviolate."
The right of trial by jury, secured in England by Magna
Charta and in this country by the constitutions of the
United States and of the several states, a right which may
not be waived in criminal cases amounting to felony, has
always been regarded as sacred and has ever been jealously
guarded by the courts. The provision of our Bill of Rights
that the right of trial by jury is to *remain* inviolate means
that all the substantial incidents and consequences which
pertain to the right of trial by jury at common law are
beyond the reach of hostile legislation and are preserved in

their ancient, substantial extent as they existed at common law. The cardinal principle is that the *essential* features of trial by jury as known to the common law must be preserved and its benefits secured to all entitled to the right. (*People v. Powell*, 87 Cal. 348, [11 L. R. A. 75, 25 Pac. 481]; *State v. Withrow*, 133 Mo. 500, [34 S. W. 245, 36 S. W. 43]; 16 R. C. L. 196.) The word "inviolate," as used in the Bill of Rights, connotes no more than freedom from *substantial* impairment, and therefore the legislature may make any reasonable regulation or condition respecting the mode of enjoying the right. (*Humphrey v. Eakeley*, 72 N. J. L. 424, [5 Ann. Cas. 929, 60 Atl. 1097]; *Conneau v. Geis*, 73 Cal. 176, [2 Am. St. Rep. 785, 14 Pac. 580]; *People v. Nakis*, 184 Cal. 105, [193 Pac. 92]; *People v. Harding*, 53 Mich. 48, [51 Am. Rep. 95, 18 N. W. 555]; *Lommen v. Minneapolis etc. Co.*, 65 Minn. 196, [60 Am. St. Rep. 450, 33 L. R. A. 437, 68 N. W. 53].) We are thus brought to consider whether our code provision for calling "alternate jurors" impinges upon any of the *substantial* incidents and consequences pertaining to the common-law right of trial by jury.

Without doubt, one of the essentials of a jury at common law is that it be composed of twelve persons, and that twelve persons, not more nor fewer, shall pass upon and determine the issues of fact. (*Jennings v. State*, 134 Wis. 307, [14 L. R. A. (N. S.) 862, and note, 114 N. W. 492]; 16 R. C. L., p. 221; L. R. A. 1917A, p. 91 et seq., note to *Minneapolis etc. Co. v. Bombolis*.) Where the procedure provided by section 1089 is followed, the jury before whom the case is actually tried does not at any time consist of more or fewer than twelve persons. Prior to the substitution of the "alternate juror," the case is being tried before the original twelve jurors. Upon the death or discharge of the incapacitated juror and the subsequent substitution of the "alternate," who previously has been examined as to his qualifications, accepted and sworn well and truly to try the matter in issue, the case continues to be tried before twelve persons. Prior to the time when the "alternate juror" is substituted for the dead or incapacitated juror, the "alternate," though he has been chosen and qualified for the possible emergency, sits and listens to the evidence, but he does not during that period of his service

sit as a "juror," within the strict literal meaning of the word. He does, however, from the very inception of the proceedings that begin with the introduction of the evidence, sit as one who has all the opportunities that are possessed by the regular jurors to see and hear the witnesses and as one who is bound by the same oath that was taken by the others to "well and truly try the matter in issue, and a true verdict render according to the evidence."

At common law, according to the established precedents, where a juror has become incapacitated by illness or death after the jury is impaneled and sworn in chief, the proper procedure appears to have been to discharge the entire panel and begin *de novo* by forming a new jury. (*Dennis* v. *State,* 96 Miss. 96, [25 L. R. A. (N. S.) 36, and note, 50 South. 499]; *West* v. *State,* 42 Fla. 244, [28 South. 430]; *State* v. *Hazledahl,* 2 N. D. 521, [16 L. R. A. 150, 52 N. W. 315].) But though this seems to have been the established common-law procedure, the common-law right of trial by jury, as guaranteed by our Bill of Rights, is not impaired by legislation that provides for the discharge of the incapacitated juror only and the calling of a new juror to be sworn and impaneled in his place, the introduction of evidence then to be begun *de novo* without reswearing any of the remaining eleven jurors or providing for any challenge to them. (*State* v. *Davis,* 31 W. Va. 390, [7 S. E. 24]; *West* v. *State, supra; State* v. *Hazledahl, supra.*) Such legislation, says the West Virginia supreme court of appeals in *State* v. *Davis, supra,* "does not abridge the right of the citizen secured to him by the constitution." The question, therefore, narrows down to this: If an incapacitated juror be discharged during the course of the trial, and an "alternate" impaneled in his place, is it an essential of the right of trial by jury, as guaranteed by our Bill of Rights, that the witnesses be resworn and give their testimony anew? That is, notwithstanding the "alternate" has seen and heard all the witnesses, is it, nevertheless, essential that, so far as the introduction of the evidence is concerned, the trial should be begun *de novo?*

The legislature, as we have seen, has the right to make any reasonable regulation or condition respecting the enjoyment of trial by jury, provided only that the *essentials* of a jury

trial as known to the common law remain unchanged. "The essential and substantive attributes or elements of jury trial," says the Minnesota supreme court in *Lommen* v. *Minneapolis etc. Co., supra,* "are and always have been number, impartiality, and unanimity." If these three essentials be preserved in all their ancient force and vigor, no reasonable procedural innovation that the legislature may see fit to adopt will, generally speaking, affect the right guaranteed by the constitution. These three essentials being completely secured and adequately guarded by suitable legislation, the right of trial by jury will remain "inviolate." Does our code provision for "alternate jurors" affect any of these three essential attributes of trial by jury? If it does not, then we may confidently affirm that the section does not affect the inviolability of the right of trial by jury.

Clearly, the section does not affect the first of the three essential attributes of a jury trial—number. As we already have pointed out, the trial is by a jury of twelve in every essential particular. Twelve persons, neither more nor less, determine the issues of fact and render the verdict. The same twelve by whom the verdict is rendered have seen and heard, with equal opportunities, all the witnesses in the case, have received the same court instructions, and, under the same legal sanctions, have had imposed upon them the same obligation well and truly to try the matter in issue.

It seems clear that the section cannot affect the second essential of a jury trial—impartiality. The juror who, up to the time when he replaces the dead or incapacitated juror, has sat throughout the trial as an "alternate," hearing and seeing all of the witnesses, has been chosen as such alternate only after an examination as to his qualifications, subject to the same challenges as the other jurors, and upon his being selected as an alternate—i. e., before the introduction of any evidence whatever—he has taken the same oath that was taken by the other jurors—an oath well and truly to try the matter in issue and a true verdict render according to the evidence (sec. 1089, ·Pen. Code, and sec. 604, Code Civ. Proc.). We may not assume that an "alternate," merely because he is conscious that it is possible that he may never be required finally to decide the case as one of the twelve by whom the verdict is rendered, will violate his oath and pay less heed to the evidence than he would if he were im-

paneled as one of the regular jurors from the inception of the trial. On the contrary, we must assume that he will obey his oath, and that he will well and truly try the matter in issue, as he has sworn to do, just as he would if he were one of the original twelve jurors. E'very safeguard that the law has thrown around the regular jurors to insure an impartial verdict, even to the extent of being kept in the custody of the sheriff during the trial, the alternate juror is surrounded with from the commencement to the end of the trial.

Nor can section 1089 affect the third of the three sssentials of a jury trial—unanimity. The verdict still must be the unanimous verdict of the twelve jurors to whom the case is finally submitted, even though one of them, before taking the place of the incapacitated juror, sits as an "alternate."

To hold, under these circumstances, that a defendant is deprived of the right to a trial by a jury of twelve simply because one of the twelve by whom the verdict is rendered may, throughout a part of the trial, have sat and listened to the evidence as an "alternate" and not as a regular juror, would be to exalt mere form above substance. To so hold would be to leave untouched the vital springs of reality and grasp at the merest shadow of substance, forgetting that "the letter killeth, but the spirit giveth life." Our conclusion on this branch of the case is that our code provision for the selection of an "alternate juror," and, if need be, for his impanelment as one of the twelve to whom the case is finally to be submitted, does not impair any of the essential attributes of a trial by jury.

[25] It next is claimed that the act whereby section 1089 was added to the Penal Code violates the constitutional requirement that "every act shall embrace but one subject, which subject shall be expressed in its title" (sec. 24, art. IV). The title of the act reads: "An act to amend the Penal Code by adding a new section, to be known as section 1089 of the Penal Code of the State of California, relating to alternate jurors." Appellant's argument is substantially this: The section relates to proceedings to be had when a juror becomes unable to perform his duties, and provides for the selection of a juror to take his place; the words "alternate jurors" are unknown to the law; therefore, so

the argument runs, the words "alternate jurors" give no clue to the purpose of the act. We are unable to agree with this contention. One of the meanings that Webster gives to the word "alternate," used as a substantive, is: "A substitute; one designated to take the place of another, if necessary, in performing some duty." For example, in political conventions in the United States an "alternate" is "one authorized to take the place of another in his absence; a substitute." (*State* v. *Carroll,* 160 Mo. 368, [60 S. W. 1087), quoting from the Century Dictionary.) In the title of the act here in question the word "alternate," though employed as an adjective qualifying the word "jurors," is obviously used in the same sense as that above given when employed as a substantive. It is clear, therefore, that the title does express the subject of the act, viz., the substitution for a dead or incapacitated juror of one who has previously been designated to take his place, if necessary. The constitutional provision requiring the subject of an act to be expressed in the title has always been liberally construed. Our supreme court has said that this must be so, because the constitution itself does not define the degree of particularity required, and the matter must, therefore, be left largely to judicial discretion. It has been said by the supreme court that if the title contains a reasonable intimation of the matters under legislative consideration, the public cannot complain (*Ex parte Liddell,* 93 Cal. 633, 638, [29 Pac. 251]); and that it is not required that the title shall disclose the purpose and scope of the act, but it is sufficient if it intelligently refer the reader to the subject to which the act applies or which is affected by it. (*Hellman* v. *Shoulters,* 114 Cal. 136, 150, [44 Pac. 915, 45 Pac. 1057].) Under the construction thus given to this constitutional provision, it cannot be held that the title here in question does not state the subject of the act with a sufficient degree of particularity. (See *Deyoe* v. *Superior Court,* 140 Cal. 476, 488, [98 Am. St. Rep. 73, 74 Pac. 28].)

[26] If it be true, as counsel assert, that section 1089 by implication amends or repeals section 1123 of the Penal Code, the section may not for that reason be held to be unconstitutional. Section 24 of article IV of the constitution declares that "no law shall be revised or amended by reference to its title, but in each case the act revised or section

amended shall be re-enacted and published at length as
revised or amended.'' It is established by the decisions of
this state that an act is not revised nor a section amended,
within the purview of the above inhibition, by an act which
adds a new code section and does not purport to repeal or
amend any of the sections of the code to which it is added.
An amendment by implication is in no proper sense of the
word an ''amendment,'' within the meaning of this consti-
tutional provision. It is not within the evils aimed at by
the inhibition. (*Hellman* v. *Shoulters,* 114 Cal. 152, [44
Pac. 915, 45 Pac. 1057]; *Deyoe* v. *Superior Court, supra;
Matter of Coburn,* 165 Cal. 202, 211, [131 Pac. 352].)

[27] Equally devoid of merit is the contention that the
act whereby section 1089 was added to the Penal Code is
unconstitutional because, according to counsel's unsupported
assertion, the bill was not read three several days in each
house, as provided by section 15 of article IV of the consti-
tution. The validity of a statute that has been duly veri-
fied, enrolled, approved and deposited in the office of the
Secretary of State cannot be impeached by a resort to the
journals of the legislature or by extrinsic evidence of any
character whatever. (*People* v. *Camp,* 42 Cal. App. 411,
[183 Pac. 845], and cases there cited.)

[28] Finally, it is urged by defendant that the district
attorney was guilty of misconduct during his examination of
certain witnesses and in the course of his argument to the
jury; and this misconduct is now assigned as reversible er-
ror. On his examination of certain of the witnesses the
district attorney asked several obviously improper questions.
In each instance an objection was at once made and sus-
tained, and the court promptly directed the jury to disre-
gard the question and its implication. It does not appear
that the district attorney contumaciously persisted in re-
peating any improper question after an objection made and
a ruling thereon. There is nothing in the record indicating
bad faith, or that the questions were asked for the wanton
purpose of raising a prejudice against the defendant. It
frequently happens that in the heat of a trial counsel ask
improper questions. But judgments cannot be reversed for
an inadvertence of this character, unless, from an examina-
tion of the record, we may be of the opinion that it has
caused a miscarriage of justice. In view of the court's

prompt rulings and instructions to disregard the questions, which it will be presumed were heeded by the jury, it cannot be said that defendant's cause suffered by reason of anything contained in these questions, however improper they may have been.

In the course of his argument to the jury the district attorney, notwithstanding the defendant had not taken the stand as a witness in her own behalf, commented upon her appearance while sitting as a prisoner before the bar, saying, among other things, that an innocent woman, facing an ordeal such as defendant was then passing through, could not sit in the courtroom without a tear. This conduct was clearly reprehensible and inexcusable, and it was the duty of the court to have interposed for defendant's protection, as doubtless it would have done had its attention been specifically called to the remarks by timely objection. The district attorney's improper comments on defendant's appearance should, and, had timely objection been made, doubtless would, have met with prompt and effective rebuke. Defendant, who had not tendered herself as a witness in the case, was at the bar of justice, not voluntarily, but by compulsion; and the prosecutor went outside the circle of fair debate when he called attention to her demeanor while at the bar to which she had been haled by the strong arm of the law. (*Bessette* v. *State*, 101 Ind. 85; *Perez* v. *Territory*, 12 Ariz. 16, [94 Pac. 1097].) But it does not necessarily follow that this misconduct necessitates a reversal. The decisions of our supreme court hold that, unless the defendant objects to the improper remarks and requests an instruction that the jury disregard them, the objectionable statements will not justify a reversal unless the district attorney's misconduct is so flagrantly and obviously prejudicial that neither a retraction nor a rebuke from the court can destroy its influence. Had the court, in response to a seasonable objection, vigorously condemned the prosecutor's remarks, as doubtless it would had its attention been called to them by timely objection, we think that they would have left no prejudicial impression on the minds of the jury. The misconduct complained of in *People* v. *Kromphold*, 172 Cal. 512, 523, [157 Pac. 599], was as flagrant as any shown here. Nevertheless, it was held in that case that it would be most unreasonable to assume that the jury could have

been influenced to the prejudice of the defendant if the judge had stated his disapproval of the objectionable remarks. By prompt action, defendant's counsel might have obtained an effective antidote for the poison in the district attorney's improper reference to the accused's appearance. But he failed to act, and defendant is, therefore, not in a position to have her complaint now considered. (*People* v. *Nakis,* 184 Cal. 105, [193 Pac. 92]; *People* v. *Shears,* 133 Cal. 154, 159, [65 Pac. 295]; *People* v. *Babcock,* 160 Cal. 537, 544, [117 Pac. 549]; *People* v. *Wong Hing,* 176 Cal. 699, [169 Pac. 357].)

For the same reason defendant cannot now be heard to complain of the district attorney's verbal assaults on defendant's counsel when criticising the course pursued by the latter in his conduct of his client's case. Defendant, who, for financial reasons, was unable to employ counsel of her own choice, was represented throughout the trial by the public defender of Los Angeles County, a paid public officer of the county, holding an office of dignity and responsibility, and who seems to have represented defendant with fidelity and zeal, with marked ability and dignified endeavor. Though the remarks directed by the district attorney toward his fellow-member of the bar and co-representative of the public weal may have been a display of poor taste, we do not see how they possibly could have prejudiced the defendant. On the contrary, addressed to fair-minded jurors, they must have recoiled to the prosecution's dire discomfiture—if, indeed, they had any effect whatever. But, be this as it may, inasmuch as the court was not once, during the course of the argument to the jury, requested to instruct the jury to disregard the improper statements of the district attorney, and as such an admonition would, doubtless, have been sufficient to cure any effect the remarks might have produced, the claimed misconduct in the argument cannot be considered on this appeal.

The defendant was ably defended, every opportunity was given her to meet the evidence adduced by the prosecution in support of the charge, the verdict was justified by the evidence, and there is no prejudicial error appearing in the record.

The judgment and order are affirmed.

Works, J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 25, 1921, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 25, 1921.

All the Justices concurred, except Lennon, J., who was absent.